UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

**-FILED-**

JUN 05 2023

At _____ M
Chanda J. Berta, Acting Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| **BRUCE MICHAEL ABRAHAMSON** )<br>in his personal capacity and in his )<br>capacity as personal representative of the )<br>estate of Elaine Abrahamson )<br>        )<br>**PLAINTIFF**, )<br>        )<br>        )<br>        v.        )<br>        )<br>**MARK ASHCRAFT, AND** )<br>**ANTHONY PHIPPS, AND** )<br>**DAN BROELMANN, AND** )<br>**STEPHEN SCHECKEL, AND** )<br>**JOHN DOES 1-10, unknown current** )<br>**and former police officers, AND** )<br>**JOHN DOES 1-10' unknown current** )<br>**and former law enforcement affiliates** )<br>**with the Town of Munster, and other** )<br>**John Does that are employees of the** )<br>**Town of Munster, AND** )<br>**DUSTIN ANDERSON, AND** )<br>**TOWN OF MUNSTER, INDIANA** )<br>**MUNSTER, IN. POLICE DEPARTMENT** )<br>**DEFENDANTS.** ) | Cause No. 2:23-CV-184<br><br>**JURY DEMAND** |

**COMPLAINT**

**I. Nature of Case**

1. This lawsuit seeks money damages against all Defendants, Town of Munster Indiana police officers ("**P.O.'s**"), Ashcraft and Phipps in their individual non-governmental capacity, Supervisory P.O.'s, Broelmann and Scheckel in their individual non-governmental capacity, Town Manager Dustin Anderson  in his individual non-governmental capacity, the Town of Munster not as a respondeat superior but for its municipal "policy or practice" and a deliberate choice of all Defendants in their non-governmental capacities breaching, by means of their "policy or practice", wrongfully and illegally causing, breaching and/or inflicting upon

1

Bruce Michael Abrahamson ("**Plaintiff**"), and where stated upon Plaintiff's Mother ("**Elaine Abrahamson**"),  each and all of the following:

a)  false arrest and;

b)  incarceration and;

c)  malicious prosecution and;

d)  defamation and:

e)  IIED.

f)  forcibly removing Elaine Abrahamson (referred to as Plaintiff's "**Mother**" or "**Elaine Abrahamson**") from her Home, and purposefully isolating her, hiding her from Plaintiff's counsel, hiding her from her own counsel and hiding her and isolating her from benefit of an independent "guardian" or Court appointed attorney or guardian of any kind and;

g)  failing to seek a guardian via the Court or via any other independent means for Elaine Abrahamson immediately before unilaterally forcing her out of her Home or when forcing her from her Home, directly contrary to her written wishes to live out her life in her Home and not to be "institutionalized" in a Hospital or Nursing Home - instead forcing her to be surrounded by individuals that committed criminal mischief in her Home namely ("**Sims caregivers**") and;

h)  breaching due process of the Abrahamsons anointing Sims caregivers illicitly and illegally and conspired with the Sims caregivers to surround and instill intentional infliction of emotional distress ("**IIED**") upon Plaintiff's Mother, despite Defendants having seen a plethora of *prima facie* evidence of the proclivity of the Sims for criminal acts as determined in both Lake County and Porter County State Courts more specifically identified, described and shown this Court in evidentiary Exhibits listed and attached hereafter as well as Defendants having confirmed with Plaintiff both in person and via telephone that Defendants Anderson, Schenckel, Ashcraft, Phipps, and Broelmann each were cognizant of the Sims caregivers' proclivity for drugs, illegal mischief past and present, as well as their drug charges pending and drug convictions on the Odyssey Court System.   In or about mid May, 2021 Plaintiff phoned Defendant Broelmann  and reported to Defendant Broelmann the Sims' illegal drug activity in Plaintiff's Home, namely Maurice D. Sims, Jr. although other Sims caregivers as well, who Plaintiff had on video camera hiding in Plaintiff's basement doing drugs in Plaintiff's Home and Plaintiff discovered Sims, Jr. had a Porter County Indiana Court

Felony charge pending against Sims, Jr. while doing drugs in Plaintiff's Home, and Plaintiff made a police report to Defendant Broelmann and to other Defendants Munster P.D. Defendants about the Sims caregivers and inexplicably Defendant Broelmann and Defendants Ashcraft and Phipps and Defendant Munster P.D. were cognizant of Maurice D. Sims, Jr. ("**Sims, Jr.**") doing illegal drugs in Plaintiff's Home and having a pending Porter County Indiana Felony drug charge against Sims, Jr. in or about April, May, June, and through July, 2021, yet these Defendants intentionally did not make a written police report, as repeatedly requested by Plaintiff to do so, of Sims caregivers' criminal mischief in Plaintiff's Home nor report Maurice D. Sims, Jr. to Porter County Authorities where Sims, Jr. had the Felony Drug charge pending, and instead these Defendants falsely informing Plaintiff that they had done so. -  SEE:  **Exhibit A** – attached to back and;

i)   Defendants through their policy making as stated herein enabling Defendants' Sims co-conspirators, identified generally above and more specifically hereafter, to hurt Plaintiff's Mother while Defendants in so doing severely contravened both Plaintiff's and his Mother's U.S. and State Constitutional rights, despite Defendants seeing, and having access to, *prima facie* evidence of the Sims caregivers proclivity for crime in State Court, in online Odyssey State Court records, and also Plaintiff had shown both Defendants Ashcraft and Phipps video footage and written emails sent to State Regulatory Authorities which was inculpatory evidence of Sims caregivers criminal mischief against Plaintiff and his Mother in the Abrahamson Home, and Plaintiff diligently, promptly and proactively made multiple Munster P.D. police reports to Defendants Ashcraft, Phipps, and Broelmann reporting criminal mischief by the Sims caregivers against Mrs. Abrahamson and Plaintiff in their Home and;

j) with intentional malice wrongfully enabling under false illegal pretense(s) Sims caregiver co-conspirators with Defendants to commit criminal acts and further criminal mischief against the Abrahamsons, in that the Sims were non-skilled "attendant" caregivers in Plaintiff's Home from about April 26th, 2021 to June 4th, 2021 Defendants knowing this fact from Plaintiff and from State Regulatory Authorities which Plaintiff notified in writing of the Sims caregivers illegal mischief in Plaintiff's Home and on his Property and these Defendants Ashcraft, Phipps and Broelmann were also shown Plaintiff's notification to State Regulatory Authorities and;

k)  despite all of the preceding facts enabling Sims caregivers to enter Plaintiff's Mother's Hospital Room illegally and surround Mrs. Abrahamson without the benefit of her own

3

counsel and/or an unbiased advocate to protect her healthcare interests, and any interests whatsoever - thereby intentionally inflicting emotional distress, **IIED** upon Plaintiff's Mother after Plaintiff showed Defendant Ashcraft on Plaintiff's "smart phone" the Sims turning cameras in Plaintiff's Home and doing drugs in the Home, telling Defendant Broelman of the same facts as well as informing Defendant Phipps who all acknowledged received this information about the Sims caregivers from both Plaintiff and the State Regulatory Authorities and;

l) In May, 2021 Plaintiff spoke with Defendant Dan Broelmann informing him also that Maurice D. Sims, Jr. not only was doing drugs in and around Plaintiff's Home that Maurice Sims, Sr. was turning cameras away from Sims' caregivers, was purposefully hurting Plaintiff's Mother, that Plaintiff reported this illegal malfeasance by these Sims State approved and licensed non-skilled caregivers regulated by the State and by the State's Regulatory Affiliate(s) and Plaintiff reported also to Defendants Ashcraft, Phipps, Broelmann and to Defendant Munster P.D. on several separate occasions in and about May and June, 2021 that other caregivers employed by the Sims were also doing drugs in Plaintiff's Home and on Plaintiff's Property and informed these Defendants that the Lake County Task Force of Northern Indiana previously arrested the principals Maurice Sims, Sr. and his wife LaTresa (Rouse) Sims of the Sims caregiver Agency, and LaTresa and Sims, Sr., Plaintiff informed Defendant Broelmann that the Sims caregivers of LaTresa's and Sims, Sr.'s guilty by default and "failure to appear" - for distribution of cocaine packets found upon LaTresa Sim's person and in Sims' Residence and Maurice Sims, Sr. was also found guilty of firing and possessing illegal firearms and both fled the jurisdiction and failed to appear – all of which was known to Defendants, yet when fleeing the jurisdiction the "Statute of Limitations is tolled" which Broelmann was cognizant of and nevertheless he and the other Defendants Ashcraft and Phipps as well as Defendants Scheckel made the policy-making decision not to bring this fact of LaTresa and Sims, Sr. having now reappeared in Lake County to the Lake County Prosecutor's Office and instead made the policy-making decision to instead have the Sims caregivers illegally enter Plaintiff's Hospital Room, isolate Plaintiff's Mother from her son under false pretense, enter the Community Hospital to render care to Mrs. Abrahamson under false pretense(s) while inflicting IIED upon Mrs. Abrahamson who told Plaintiff she was afraid of Sims caregivers and Plaintiff told his Mother he had reported the Sims caregivers to both to the Munster P.D. and to State Regulatory Authorities and her response was "good I'm afraid of them they hurt

4

me" and Plaintiff assured his Mother his was working as fast as he could to get rid of the Sims caregivers.  See Exhibit B: Arrest of LaTresa (Rouse) Sims and Maurice Sims, Sr. attached to the back hereto,  and to Exhibit C which is a "mugshot" of Maurice Sims, Sr. who has proclivity for drugs, battery, threatening assault, distribution and possession of drugs and illegal weapons upon his person, who threatened Plaintiff with violence while in Plaintiff's Home as reported to Defendants, see current pending Felony charge against Maurice Sims, Sr. Exhibit A: 2021 Pending Felony Sims, Jr. attached, and Exhibit B: LaTresa & Maurice Sr. Sims Arrests & Convictions Dealing & Using Cocaine, and  Exhibit C: Mugshot Sims, Sr.

m)  Irrespective of the above facts +  Defendants made the policy decision to violate both, Plaintiff's and his Mother's constitutional rights  –  forcing Elaine Abrahamson against her will and Plaintiff's will, to leave Mrs. Abrahamson's  Home and;

j)  be isolated and held against her will in Community Hospital and +   + to be surrounded by the Sims  -   individuals with  the proclivity for weapons and drugs having on the Sims' criminal Court records multiple criminal drug charges, pending and past felony drug and weapons charges,

k)  not only using illicit coercive tactics against Plaintiff and his Mother by forcibly removing Plaintiff from caring for his Mother in any manner whatsoever, contravening the Abrahamsons' U.S. and State Constitutional rights and instead removing Plaintiff's Mother against her will from her Home without the benefit of independent counsel, a guardian, allowing her to remain in her Home with the benefit of a guardian and making arrangement(s) with her attorney(s) and Plaintiff's attorney, instead forcing Sims caregivers to surround Mrs. Abrahamson who are known to Defendants to have committed egregious criminal mischief while in the Abrahamsons' Home, and thereby these Defendants using policy-making torture-like techniques which "shock the conscience" by enabling the Sims caregivers into Community Hospital when their license is solely for "Home non-skilled attendant care" and further into Mrs. Abrahamson's Hospital Room to suround her with Defendants knew full well had multiple past, present felony charges in April through July, 2021 – with a pending "plea agreement" by the Porter County Indiana Prosecutor's Office and instead of reporting Maurice D. Sims, Jr. to the Porter County Prosecutor for violating his felony drug plea agreement instead letting the Defendants' Sims co-conspirators have illegal access to Mrs. Abrahamson when Plaintiff told Defendants that he and his Mother are concerned for their safety, Plaintiff having called "911" for two Defendants to accompany his

back to his Home because Maurice Sims, Sr. was turning cameras again, hurting his Mother, and ostensibly high and/or inebriated on alcohol or another hallucinogen and torturing Plaintiff and his Mother by Defendants authorizing and illegally sending Sims caregivers into Plaintiff's Mother's Hospital Rooom, isolating her from:

l)   Plaintiff's defense counsel, and from Elaine Abrahamson's attorneys, and by these Defendants doing so violated Plaintiff's right, and Elaine's right of familial association intentionally targeting it under false pretense, Defendants maliciously and purposefully targeted Plaintiff's right to familial association with his Mother by illegal means in furtherance of their illegal contrivances, disregarded Elaine's verbal commands to Defendants stating on video and audio captioning when Defendants Ashcraft and Phipps both were permitted to see Mrs. Abrahamson and talk to her unrestricted by Plaintiff and when they asked her how she was doing she immediately responded to Defendants

"I'm fine and.....get the hell out of here (her Home) and leave me alone".

Defendants refused to listen to her and to Plaintiff as elaborated upon herein and instead using illicit and illegal "police powers" disregarded all of the exculpatory information provided to Defendants by Elaine Abrahamson in her own words, as well as *prima facie* evidence stated herein.

Instead Defendants made a policy-making decision to instead conspire with the Sims to include contrived, false information against the Abrahamsons to disregard all exculpatory evidence that Plaintiff and his Mother both affirmatively stated to Defendants and the Abrahamsons by choice were living peaceably in harmony together so that Plaintiff could allow his Mother to avoid being Hospitalized unnecessarily and/or institutionalized in a Nursing Home all of which Plaintiff informed these Defendants of.

Defendants prepared an illegal prejudicial Probable Cause Affidavit prepared by Defendant Ashcraft, making false attestations therein as stated.

Defendants illicitly anointed their Sims co-conspirators to cause extreme outrageous torts upon Plaintiff and his Mother and  -  thereby inability of Plaintiff to see or communicate by phone nor in any manner with his only Family via a guardian of his Mother, attorneys lawfully appointed by his Mother, and all of Defendants policy-making decisions against Plaintiff and

his Mother were intentional direct attacks against the Abrahamsons' Family right to peaceably live together without this unlawful government interference and;

m)    inability for Plaintiff to render care and advocate for his Mother pursuant to Plaintiff's desire to do so and despite Plaintiff's Mother desire that Plaintiff do so and;

n)    Defendants leaving out a plethora of exculpatory evidence in a "Probable Cause Affidavit" for crimes of which Plaintiff was completely factually innocent.

o)    Defendants purposefully ignored Plaintiff's repeated sharing of inculpatory criminal misconduct committed by the Sims non-skilled caregivers in Plaintiff's Home, namely the Sims and their cohorts, wherein Plaintiff brought the Sims criminal mischief to Defendants' attention repeatedly – informing Defendants thereof, calling Defendants, sharing with Defendants   video and audio recordings and written reports pertaining to   Sims illicit activities in Plaintiff's Home, Defendants Ashcraft, Phipps and Broelmann beyond illegally allowing their Sims co-conspirators into Mrs. Abrahamson's Community Hospital Room and illegally isolating her – also contrived against Plaintiff to purposefully deceive Plaintiff into believing they made police reports pertaining to the Sims criminal mischief as reported to these Defendants, discrediting the Sims "so-called" witnesses which was "exculpatory information" as if related to these Defendants' policy-making decision to exclude all exculpatory information and instead potentiated, encouraged and illegally gave Sims co-conspirators with Defendants the ability thereby to continue committing criminal activity against Plaintiff and his Mother in the Hospital and otherwise as stated herein.

Despite all of these facts these Defendants  enlisted and anointed Sims to render Health care to Elaine Abrahamson, to illegally bill Elaine Abrahamson's Medicare and Medicaid for inflicting outrageous IIED with the Sims upon her - all after Defendants forcibly removed her from her Home isolating her from anyone she could trust as stated herein, Defendants solely anointed the Sims to surround Elaine Abrahamson in her Hospital room and:

p) Defendants doing each of the wrongful and illegal acts complained of by Plaintiff herein - thereby caused not only outrageous and shockingly the worst possible nightmare Plaintiff and his Mother could ever imagine and by doing so these Defendants with their illegal policy-making decision caused Plaintiff and his Mother both suffer Defendants' inflicting of IIED upon Plaintiff and his Mother and the wrongful death of Plaintiff's Mother and;

q) severe torts upon Plaintiff severely disrupting the balance of Plaintiff's life.

2.    Plaintiff was appointed as Personal Representative of his Mother.    See: _Exhibit  D_
Plaintiff appointed Personal Representative of his Mother - attached to back.

## II. Jurisdiction and Venue

3. This action is brought pursuant to 42 U.S.C. §1983 and is premised on the Fourth and
Fourteenth amendments to the United States Constitution. This Court has original subject
matter jurisdiction of the federal questions presented pursuant to 28 U.S.C. §§1331 and 1343,
the Rehabilitation Act of 1973; the Americans with Disabilities Act as amended and 42 U.S.C. §
1983 to redress the deprivation, under color of state law, of rights secured by federal law.
4. Venue is proper in this Court and Division, pursuant to 28 U.S.C. §1391, because the events
giving rise to this action occurred in, and the defendant is a resident of, the County of Lake,
the Town of Munster, Indiana, which is located in the Hammond Division of the Northern
District of Indiana.

## III. Parties

5. Plaintiff is an adult resident of Lake County Indiana.

6.  Plaintiff's Mother was an adult life-long resident of Lake County Indiana until her death on
or about July 2nd, 2021.

7.  Plaintiff's Mother requested Plaintiff to allow her to reside with Plaintiff so that she could
live independent of a Nursing Home and remain with her son which Plaintiff and his Mother
mutually agreed upon.

8.  Plaintiff and his Mother lived together peaceably for over a decade just prior to her death.

9. Defendant Mark Ashcraft is a resident of Indiana and is a police officer employed during
the torts Plaintiff complains of herein  -  by Defendant Town of Munster.    He is sued in his
individual capacity.

10.  Defendant Anthony Phipps  is a resident of Indiana and is a police officer employed during the torts Plaintiffs' complains of herein  -  by Defendant Town of Munster.    He is sued in his individual capacity.

11.  Defendant Anthony Phipps  is a resident of Indiana and is a police officer employed during the torts Plaintiffs' complains of herein  -  by Defendant Town of Munster.    He is sued in his individual capacity.

12.  Defendant Dan Broelmann is a resident of Indiana and is the Defendant "Munster Police Department's" ("P.D.'s"), Patrol Division Commander, and supervises the Munster Community Policing Unit and hence makes policy decisions.

13.  Defendant Steve Scheckel is a resident of Indiana and is the Defendant "Munster Police Department's" ("P.D.'s") Chief of Police, and also supervises the Munster Community Policing Unit and hence makes policy decisions.

14.  Defendant Dustin Anderson is a resident of Indiana and is the Defendant Town of Munster's Town Manager and is responsible for "day to day management of the town" as well as oversees the Defendant Munster Police Department and makes policy decisions.  He has a Bachelors degree in criminal justice from Indiana University.

### IV. Facts

15. Plaintiff is a resident of Lake County, Indiana.

16. In early 2020 Plaintiff had to undergo a total hip replacement and he decided with his physicians that it was medically necessary.

17.  In 2021 Plaintiff was 66 years of age and took care of his 89 year old mother, who lived by choice and by mutual agreement with Plaintiff in Plaintiff's Home situated in Munster, IN. for many years.

18.  Plaintiff was an advocate and primary caregiver for his Mother caring for his Mother because he wanted to and she requested that he do so, and in brief  -   managed her medical appointments, seeking medical care for her when necessary, commuting to appointments with her by air travel and/or car, and making her life as pleasant and convenient as possible solely because Plaintiff wanted to because his Mother asked him to and without hesitation Plaintiff

agreed to care for his Mother during her time of need – which Plaintiff's care for his Mother was mutually agreed upon for over a decade prior to her death on July 2nd, 2021.

19.  July 2nd, 2021 was the worst day of Plaintiff's life because his Mother died on this day, was Plaintiff's only Family, and Plaintiff cherished his Mother greatly.

20.  Plaintiff voluntarily dedicated many years of his adult life making certain that his Mother received the best possible skilled Health Care as well as the best possible requisite non-skilled Home Health care inside Plaintiff's Home and outside of Plaintiff's Home for many years.

21.  Caregiving was rendered to Elaine Abrahamson by caregivers, by Plaintiff, Physicians, Nurses, Home Health Aides, ancillary Care Professionals in Plaintiff's Home and outside of Plaintiff's Home during May, 2021 through July 2nd, 2021 to care for his Mother in Plaintiff's Home keeping her safe, healthy and comfortable therein - despite Plaintiff having had: major surgeries and some medical physical ailments due to Plaintiff's age and despite Plaintiff being the victim of a severe "hit and run" vehicular crash caused by others and causing personal injury to Plaintiff.

22.  Plaintiff conscientiously spent weeks, months and years of advocacy to keep Plaintiff's Mother safe, healthy, comfortable and vibrant by meeting with others on his Mother's behalf and her request for Plaintiff to do so for over a decade prior to her death and prioritizing his Mother's well being by either making medical appointments for her and/or appearing with his Mother at physician's Offices, meeting with Physicians, Nurses, Physical Therapists, or whenever necessary as her duly authorized Power of Attorney for all of her Health Care and requisite needs of any kind to remain in her Home and to live out her life peaceably with Plaintiff.

23.  Further for over a decade Plaintiff made appointments for his Mother as well as either drove her and/or flew with her to highly esteemed Medical Centers where Plaintiff knew physicians and Hospital Administrators at: appointments, hearings, meetings, to seek out the best possible treatment possible for Plaintiff's Mother for routine and emergent medical, surgical care and dental care rendered by physicians, dentists, oral hygienists, oral surgeons, nurses, physical therapists, Medicaid and Medicare Representatives, pharmacists, medical specialists, and Home Health Care and Supply Companies to make certain that his Mother was cared for in an exemplary and excellent manner for well over a decade prior to her death. Plaintiff and his Mother lived together peacefully - with Plaintiff rendering as an adult biological child of his Mother the utmost care, respect and unconditional love for his Mother

to reciprocate for Plaintiff's Mother's unconditional caring and providing for Plaintiff during his early years of his life and beyond with mutual admiration and respect for each other.

24.    Plaintiff having a valid Power of Attorney in 2012 through 2021 in perpetuity, which Plaintiff informed Defendants Anderson, Broelmann, Ashcraft, and Phipps of, hence Plaintiff needed assistance to properly care for his Mother due to Plaintiff's own ailments and Plaintiff on behalf of his Mother with her concurrence applied for Medicaid waiver services in the late summer or early fall of 2012.

25.    After spending time on the waiting list for Medicaid waiver services, she was granted eligibility for Medicaid waiver services as of January 1, 2013. She was deemed eligible for services under Indiana's Medicaid waiver for the aged and disabled (A & D waiver) all of which Plaintiff had done because his Mother informed Plaintiff that she did not under any circumstances want to be "institutionalized" into Hospitalization and/or a Nursing Home and wanted to live out her life with Plaintiff with his concurrence of which Plaintiff agreed to all of which Plaintiff informed Defendant Anderson, Broelmann, Ashcraft and Phipps.  Plaintiff in or about the last quarter of 2020 phoned Defendant Anderson and inquired if the Town of Munster had any type of Agreement with Superior Ambulance and he informed indeed there was that if ever "A & D waiver" non-skilled caregivers "call off" or fail to show-up to assist Plaintiff in caring for his Mother to dial "911" and inform them Plaintiff and his Mother need the Town of Munster "lift service" in that Plaintiff's Mother was disabled, Plaintiff was her sole Family and advocate and could not safely get her to the commode from her living areas downstairs in the Home to upstairs and that she did not want to under any circumstances want to unnecessarily have to go into the Hospital or a Nursing Home having worked in both as a registered nurse.    Defendants Broelmann, Ashcraft, Phipps and other unnamed P.O. Defendant(s) were informed of the preceding fact.

26.  Plaintiff's Mother was granted eligibility for Medicaid waiver services January 1, 2013. She was deemed eligible for services under Indiana's Medicaid waiver for the aged and disabled.

27. The purpose of Medicaid waiver services is to allow a person who is eligible for Medicaid to remain living at home rather than living in an institutional setting, such as a nursing home. See 42 U.S.C. § 1396n(c)(1). Medicaid waiver services provide not only a higher quality of life for the recipient, particularly if the participant has an advocate and primary caregiver such as Plaintiff who is knowledgeable in medical care and all facets of Mrs. Abrahamson requisites to live out her life as long as feasible with Plaintiff's advocacy.

28. She required assistance in activities of daily living including walking, transfer (from bed to chair, from chair to upright, etc.), bathing, toileting, and activities such as meal preparation, assistance with feeding, medications, medical appointments, bathing, toileting, dressing all of which are assisted dailly living ("ADL's"), shopping, etc. - all of which Plaintiff did for his Mother and later with one A & D Waiver assistant and later due to advancing age of Mrs. Abrahamson and of Plaintiff two assistants were absolutely necessary.

29. Elaine Abrahamson qualified as a person with a disability under both the Americans with Disabilities Act and Rehabilitation Act.

30. In advocating for Elaine Abrahamson to maintain her A & D Waiver benefits Plaintiff on behalf of his Mother to advocate for her rights and benefits and voluntarily of his own desire to do so for his Mother attended at least six administrative hearings on eligibility issues for A & D Waiver. Each time the administrative hearing officer a.k.a. administrative law judge, an attorney, determined that Elaine Abrahamson remained eligible for waiver services after hearing Plaintiff's advocacy and presentation on behalf of his Mother.

31. All of the preceding of which Defendants were informed of by Plaintiff.

32. The Division of Aged is within the IN. Dept. of Family and Social Services Administration and so is the State Adult Protective Services (collectively "**FSSA**").   Plaintiff not only prevailed against the FSSA attempting to arbitrarily and capriciously attempting to cancel Elaine Abrahamson's A & D Waiver benefits inexplicably.   In the winter of 2014 and first quarter of 2015 FSSA through it's Director of the Division of Aged and another female employed therein was again arbitrarily and capriciously withholding ramps to go outside that Plaintiff's Mother needed or she would be trapped inside which she was due to FSSA's retaliating against Plaintiff for having won at least six Hearings that the ALJ  ruled in favor of the Abrahamsons.

12

33. Plaintiff researched the law for his Mother and determined that he could file suit against the FSSA and compel the issuance of his Mother's ramps to allow her to safely exit the Home she was trapped in due to unlawful retaliation against Plaintiff, and thereby his Mother for filing for administrative hearings and then ultimately administrative relief to retain Mrs. Abrahamson's A & D Waiver benefits that she was approved for and qualified for. Due to the preceding advocacy by Plaintiff for his Mother and his ability to prevail on her behalf – an employee of an affiliate entity of the FSSA privately informed Plaintiff that the Division of Aged and Disabled was causing problems for Mrs. Abrahamson because of Plaintiff's advocacy for her and thereby her ability to obtain favorable rulings at hearings against this Division of Aged and Disabled. When the Defendants in this instant lawsuit docket started in with contrivances against Plaintiff and thereby his Mother in the same adversarial manner - Federal Law provides for relief from these retaliatory acts against the Abrahamsons, namely: Plaintiff sues Defendants in pertinent part in accord with standing under the anti-retaliation provisions of both section 504 of the rehabilitation act of 1973 and Title II of the Americans with disabilities act ("ADA") both of which protect Plaintiff advocating on behalf of a disabled person, such as Plaintiff's Mother on issues related to her civil rights.

34. The anti-retaliation provision of section 504 grant standing to non- disabled people who are retaliated against for attempting to protect the rights of the disabled.

35. 29 USC section 794 (a) (codifying section 504). Section 504 incorporates the anti-retaliation provision of title VI of the civil rights act of 1964.

36. The anti-retaliation provision of title VI of the civil rights act, incorporated by section 504 states in pertinent part:

37. No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the civil rights act or this part, or because he has made a complaint, testified against, or participated in any manner in an investigation, proceeding, or hearing under this part. 34 C.F.R. Sect. 100.7(e).

38. Plaintiff had no criminal record and no motive whatsoever to harm his Mother in any manner whatsoever and Plaintiff's Mother never hurt Plaintiff in any manner whatsoever during their lifetime of respect, love and admiration for each other.

13

39.  Plaintiff put off for as long as he possibly could a surgical operation of his left hip occurring  in or about January, 2020 due to severe osteoarthritis of his left hip, delaying his own well being to care for his Mother as long as he could delay the hip surgery because he wanted to make certain that nothing adverse would happen to his Mother  because she was doing well.

40.  Plaintiff on his own opted for an "anterior approach" of his left hip surgical procedure so that Plaintiff's post-operative recovery would be of shorter duration so that Plaintiff could resume care for his Mother post-operatively as soon as possible and make certain she continued to do well.

41.  Further to the immediately preceding Plaintiff on his own initiative made arrangements with "Kelly" an Executive Officer of Munster Med Inn in patient Facility in 2020 during the pandemic that if an unforeseen event or complication of Plaintiff occurred during or after his surgery that Elaine Abrahamson could be immediately transported from Plaintiff's Home to the Munster Med Inn to avoid Hospitalization, Covid-19 or any other deleterious event should Plaintiff's ability to continue to advocate for, render care for, and supervise care for his elderly Mother be adversely interrupted by an unforeseen complication of major surgery and/or anesthesia for his hip surgery.   Plaintiff did this for each and every surgery that he underwent – even leaving his post-operative care earlier then recommended just to be certain that his Mother was look after, comfortable and remained healthy as she did while cared for by Plaintiff.

42.  After Plaintiff's above surgery the Covid-19 pandemic became more pronounced in Lake County Indiana and there was a shortage of "non-skilled" Home Caregivers wherein Plaintiff's Mother needed two throughout the daytime from about 10am until 11pm to assist Plaintiff care for his Mother with her assisted daily living and to be able to carefully move from transport chair that and two chairlifts Plaintiff arranged to be brought into and installed into Plaintiff's Home.

43.  Plaintiff settled upon the only State approved non-skilled, attendant Home care giving entity in Porter County Indiana that he could locate which was owned by Maurice Sims, Sr. and LaTresa (Rouse) Sims and they named it:  Sims Signature Personal Care LLC ("**Sims' Agency**"), registered with the IN. Secretary of State and approved within the IN. Department of Family Social Services to render IN. Medicaid Waiver Services for "attendant non-skilled care giving".

44. Plaintiff enrolled his Mother years prior to Sims' Agency being allowed to render attendant care in Plaintiff's Home.

45. In or about May, 2021, after Plaintiff having phoned day and night to find a home care company to keep Plaintiff's Mother out of a nursing Home pursuant to her express wishes, and Plaintiff also knowing that if she went into a Nursing Home at an advanced age during the 2019 through 2021 and beyond Covid-19 pandemic that it would be more likely then not that she would contract Covid-19 and/or be left to deteriorate because staffing to nursing home resident ratio is extremely poor particularly in calendar year 2021 in the midst of the Covid-19 pandemic staffing was extremely limited many caregivers contract and/or spread the Covid-19 Nursing Home Residents.

46. Plaintiff shared this information with Defendants and told them that Plaintiff takes excellent care of his Mother because she was a registered nurse and she was emphatic that at all costs she wanted to avoid being Hospitalized and/or institutionalized during her advanced years in that she often told Plaintiff of the substandard care that she witnessed as a nursing student and as an Indiana practicing nurse and also being involved in nursing education and working closely during and after completing Nursing School as a Indiana University graduate Registered Nurse in Northern Indiana Community Hospitals.

47. Plaintiff's Mother was appointed by Indiana's first physician Governor of the State, Otis R. Bowen, M.D., to serve two consecutive terms of eight years as an advisor to the Board of Trustees to Indiana University and to Purdue University.

48. Upon Governor Bowen being appointed by President Ronald Reagan to be Secretary of Health and Human Services Governor Bowen introduced Plaintiff's Mother to Governor Bob Orr, successor to Governor Bowen and Governor Orr also was impressed with Plaintiff's Mother's education and demeanor and he then reappointed her for a third four year term and she served the State of Indiana, Indiana University and Purdue University, with their Board of Trustees on a *pro bono* basis for twelve years enjoying her role working with Administrators, Chancellors and the Presidents of the State's Universities.

49. Plaintiff's Mother was equally devoted to her Family and despite Plaintiff being limited post-op from hip surgery and having had other surgery limiting what physically Plaintiff could do for his Mother to keep her out of a Nursing Home Plaintiff did everything within his power to get his surgeries done properly, streamlined and without complication to return caring for his Mother.

15

50.   In or about April and May 2021 Plaintiff called multiple non-skilled Home Care Companies the only one Plaintiff could secure to meet his Mother's need of two caregivers for ten hours seven days a week was: Sims Signature Personal Care LLC ("Personal Care") is a company registered in the State of Indiana and on information and belief owned by a husband and wife: Maurice Sims, Sr ("Maurice, Sr.") and LaTresa (Rouse) Sims ("LaTresa") and was staffed with caregivers by their son, Maurice Sims, Jr. ("Maurice, Jr.").

51.  Maurice, Sr., LaTresa, and Maurice, Jr. (collectively "Sims") all had the proclivity for their own personal use of illegal drugs, namely cocaine, cannabis ("illegal drugs") as well as illegal weapons for the Sims' distribution, sale and personal consumption of these illegal drugs as well as dealing in illegal drugs both for their own consumption and for the Sims' profit.

See:   EXHIBIT B -  Attached to back and Plaintiff told Defendants Ashcraft, Phipps and Broelmann of the Sims' past drug convictions, pending felony drug charge(s), and their proclivity for drug and illegal weapon use and to assist Plaintiff in getting rid of the Sims – which Defendants inexplicably refused to do.

52.  The Sims registered a Home Care Agency domiciled in Porter County Indiana named Sims Signature Personal Care LLC ("Personal Care Agency" or "Agency") which is a company registered in the State of Indiana solely for non-skilled Home Health, emphasis added, care of dependents – and Defendants were told this and thereby knew this.

53.   The Sims individually and their Personal Care Agency advertised and solicited for rendering home care for the elderly namely during the Covid-19 U.S. Pandemic which commenced in calendar year 2019 and through and including 2021.

54.  Plaintiff met with LaTresa and her designate alleged to have been her Manager of the Personal Care Agency outside of his Home where LaTresa begged Plaintiff to hire Sims' Agency. Again Plaintiff informed Defendants of this fact and hence Defendants knew this.

55.  Plaintiff met with LaTresa and Maurice April 24th, 2021 and on or about the following day along with Sims' care giving Aides and again LaTresa begged Plaintiff to hire her Agency clasping her hands together informing Plaintiff that LaTresa is "very religious".

56.  Plaintiff needing caregivers in that the pandemic made staff in Lake County Indiana very difficult if not impossible to procure.

57.  Plaintiff's goal was to keep his Mother healthy and vibrant in his Home and to keep her out of the Hospital and/or a nursing Home particularly during the "Covid-19" pandemic that occurred through the illegal acts of Defendants described as stated herein.

58. Plaintiff agreed to allow Sims and the Agency entry into Plaintiff's Home the following day after the date last referenced above - for rendering home care services for Plaintiff's Mother and on April 26, 2021 Plaintiff hired LaTresa and Maurice and their Personal Care Agency to assist Plaintiff to care for his Mother, Elaine Abrahamson.

59. As a precaution, Michael had cameras placed throughout the home to ensure that he was able to monitor the caregivers while they were inside the home.

60. On or about June 4th, 2021 the Defendants arrived at Plaintiff's Home and placed Plaintiff under arrest alleging Plaintiff neglected his Mother when assisting her with supervising caregivers with what is known as Adult Daily Living ("ADL") tasks namely, brushing teeth, applying and removing compression stockings (only Plaintiff was to do due to caregivers tearing her skin) every morning and just prior to caregivers placing Plaintiff's Mother onto her bed, proper hygiene such as hair washing, grooming, etc. - Plaintiff making certain that caregivers Plaintiff hired to care for his Mother properly rendered this efficiently and completely along with light housekeeping - all care that they were paid to do.

61.     Plaintiff alarmed at illicit acts being committed on camera in his Home by the Sims and that Plaintiff noticed - and Plaintiff's Mother told Plaintiff that she "was afraid of the Sims and their caregivers" (which Plaintiff's Mother verbalized avidly to Plaintiff) hence Plaintiff notified State Medicaid Waiver Home Health Comptroller State Authorities reporting that the Home Health Agency Plaintiff hired was bringing staff into Plaintiff's Home and automobile and surrounding Residential Property doing illegal drugs such as cannabis, and turning cameras throughout Plaintiff's Home to avoid detection by Plaintiff (and others) of illegal drug use, negligent care of Plaintiff's Mother, and purposefully physically harming Plaintiff's Mother and doing illicit acts around her..

62.     Plaintiff promptly telephoned the Town of Munster Police Department and asked to speak with Defendant "Field Commander" Lieutenant Daniel Broelmann and explained to him the immediately preceding and additionally the fact that Maurice D. Sims, Jr., his co-workers, his Father, Maurice Sims, Sr. were all going in and outside of Plaintiff's Home frequently day and night utilizing illegal drugs in and around Plaintiff's Home, in Plaintiff's four door auto sedan (four passenger full size vehicle) in the rear bench seat, and the Sims, Maurice Sims, Sr., LaTresa, and their son, Maurice D. Sims, Jr. as well as their health care aides were running in and out of Plaintiff's Home into their cars parked at Plaintiff's Property

doing drugs - and that Plaintiff was very concerned both for his Mother's safety and well being as well as for Plaintiff's safety and well being.

63.    Plaintiff also informed Defendant Lieutenant Dan Broelmann that the owners of the Home Health Care Agency, Maurice and LaTresa Sims (collectively all Agency owners and workers referred to hereafter as "**Sims**") - whose Family, friends and co-workers they brought into Plaintiff's Home had multiple criminal drug charges either pending or in the past, multiple drug convictions and extremely disturbing to Plaintiff was the fact that Plaintiff discovered just prior to phoning Defendant Lieutenant Dan Broelmann was the fact that the Sims' son, Maurice D. Sims, Jr. was constantly turning cameras to avoid detection of both doing drugs in Plaintiff's Home and to avoid being seen purposefully unnecessarily harming Plaintiff's Mother for Plaintiff having reported Maurice Jr. to the Munster Police Department, to Defendants Munster P.D Police Officers ("**P.O.**") Broelmann, Ashcraft, Phipps and Defendants John Does 1-10 and John Does 1-10' for doing drugs, turning cameras away from field of vision Sims' caregivers, and purposefully physically harming Plaintiff's Mother and causing her extreme discomfort:  physically, verbally and emotionally – all of which was communicated by Plaintiff to all Defendants.

64.    Incrediously, instead of working with Plaintiff to assist him get rid of the Sims from his Home the Munster P.D. having acknowledged to Plaintiff that the Defendants too saw the history of drug convictions by the Sims and a pending felony drug charged against the Sims' caregiver Maurice D. Sims, Jr. via the State Odyssey Court System that the Sims' owner of the Agency too had multiple drug convictions along with his son caregiver, Maurice D. Sims, Jr., then having a pending felony drug charge against him while also seen on camera doing drugs in Plaintiff's Home, all of which was informed to State Authorities who saw the videos of Sims illicit acts as stated as well as Maurice Sims, Sr. stating vulgarities to Plaintiff's Mother's face, ripping off her Compression stockings, throwing Plaintiff's Mother into bed and turning cameras to attempt to avoid detection, yet one camera faced a mirror in Plaintiff's Mother's bedroom capturing this abhorrent aberrant misconduct by Sims prompting Plaintiff to call "911" emergency services to dispatch Defendant John Does 1-10 to Plaintiff's Home    – nevertheless despite all of the preceding, the Munster P.D. on Friday, June 4th, 2021 arrested Plaintiff despite the Sims' torts Plaintiff reported to the Munster P.D. (prior to June 4th, 2021) and while arresting Plaintiff had dispatched a Superior Ambulance with two EMT's (one ambulance and two Superior Ambulance EMT's) to forcibly remove Plaintiff's Mother from

her residence forcing her first secretly into Community Hospital, Munster, IN. and Defendants instructed the Sims to illegally accompany Plaintiff's Mother into Community Hospital illicitly giving the Sims tortfeasors and abusers of Plaintiff's Mother, despite the Sims having abused Plaintiff's Mother and nevertheless, at Defendants' direction, Defendants Ashcraft and Phipps, along with Defendants John Does 1-10, illicitly, illegally, maliciously and purposefully forced Plaintiff into incarceration and his Mother to go to Community Hospital to be "guarded and cared for" by the Sims (abusers of Plaintiff's Mother) and thereafter Defendants hiding Plaintiff's Mother from Plaintiff, from Plaintiff's defense counsel, and from Plaintiff's Mother's attorneys - into a Nursing Home and keeping Plaintiff and his Mother from seeing or speaking to each other – Defendants hiding Plaintiff's Mother from her Attorneys, from Plaintiff's criminal Defense counsel, and instead conspired with Defendants' Sims co-conspirators, to hide Plaintiff's Mother from:

a)  Plaintiff and from:

b)  Attorneys that were avidly trying to locate Mrs. Elaine Abrahamson to advocate for, and protect to her from these Defendants, and from their co-conspirators: who purposefully and collectively contrived and conspired together to conceal all exculpatory information and instead contrived together to utilize inculpatory information that was false and thereby impugning Plaintiff under false, specious, contrived information with Defendants' Sims co-conspirators in so doing.

65.  Defendants and their Sims co-conspirators as further elaborated upon hereafter hid Mrs. Abrahamson from Plaintiff and her attorneys and thereby in doing so she was forced out of her Home by Defendants and in isolating and hiding Mrs. Abrahamson from Plaintifff under false contrived information contained in Defendants' charging Probable Cause ("P.C.") Ashcraft Affidavit, Mrs. Abrahamson was denied any due process whatsoever by Defendants and thereby was purposefully denied Plaintiff's ability and his Mother's ability to stop Defendants and_the Sims co-conspirators of Defendants from continued abuse, wrongful control of her Health Care within the Community Hospital where Defendants forced her out of the comfort of her Home and thereby incredulously Defendants used their "police powers" illicitly to allow and enable Defendants' Sims co-conspirators to inflict more intentional infliction of emotional distress ("IIED") upon Plaintiff's Mother and enabling the Sims to further hurt her in Community Hospital -  while being paid to do so through the Sims billing

federal Medicaid while in Mrs. Abrahamson's Hospital Room – as further elaborated upon hereafter.

66.  Defendants hid Plaintiff's Mother from his criminal defense attorney and from her attorneys - until such time that she died from the Defendants' torts complained of herein. Defendant, Munster Police Officer ("**P.O.**") Mark Ashcraft failed to conduct a thorough investigation and improperly targeted Plaintiff, as well as Plaintiff's Mother - for Sims' neglect, abuse, drug use, turning cameras and vilifying Plaintiff for having reported the Sims to the Munster Police, for having video and audio recorded the Sims doing illicit acts against Plaintiff's Mother, and for having also reported the Sims to State Health Regulatory Authorities to stop the Sims from further hurting Plaintiff's Mother.

67.  Increduously, Defendants Ashcraft, Phipps, and Broelmann incarcerated Plaintiff for protecting his Mother from the Sims, and even more shockingly hid Plaintiff's Mother from: Plaintiff, from her Attorneys who were to advocate for her protection and for her care and well being, and in furtherance of Defendants' deliberate refusal to stop the Sims from causing harm and IIED to Plaintiff and his Mother, these Defendants with malice - sent the Sims abusers, Sims  tortfeasors, drug users and physical abusers of Plaintiff's Mother illegally into Plaintiff's Mother's Hospital Room at Community Hospital instructing the Sims co-conspirators to tell untruths to the Hospital staff about a State Authority having hired the Sims instead of Plaintiff which both conspirators, the Defendants and the Sims contrived to purposefully impugn Plaintiff under false charges contrived by these Defendants and their co-conspirators, the Sims.

68.  These Defendants having conspired with the Sims to commit torts and outrageous misconduct against both Plaintiff and his Mother thereby enabling the Sims co-conspirators with Defendants to inflict more abuse and illegal acts upon Plaintiff and his Mother all contrary to federally enacted Health Information Public Policy Act ("**HIPPA**") statutes, contrary to the Indiana State license of the Sim's Agency, contrary to federally enacted Medicare Guidelines,  contrary to both State and federally enacted laws to protect both Plaintiff and his Mother from these illegal acts by Defendants which was contrary to the Americans with Disabilities Act of 1990 or "ADA" Title 42 § 12101, the federally enacted civil right law prohibiting discrimination based upon disability which both Plaintiff and his Mother had, and hence and are/were (respectively) protected under (the above happened in May and June, 2021) and the ADA, which protects against discrimination against both Plaintiff and his

Mother based upon religion to Americans with disabilities as the Civil Rights Act of 1964, which these Defendants were illegally so doing inflicting purposeful, harsh and malicous IIED and other torts specifically delineated herein, and hereafter.

69. The torts committed by Defendants is contrary to both State and federal Public Policy and Procedure as it relates to police powers, the U.S. Constitution, and the Defendants in instructing their Sims co-conspirators to under false pretense gain entry to Plaintiff's Mother's Community Hospital Room, to annoint the Sims co-conspirators as Mrs. Abrahamson's duly appointed Health Care Providers in Community Hospital contrary to the written instructions to Community Hospital by Mrs. Abrahamson with the Health Care Power of Attorney for Health Care in the front of Mrs. Abrahamson's chart and Plaintiff showing Defendants Mrs. Abrahamson's P.O.A. for all acts Health and otherwise – to hire, discharge, control her benefits, hire and/or discharge legal counsel on her behalf, hire and discharge the Sims: all exculpatory information which Defendants hid from Prosecutors, Magistrate Judge(s), Community Hospital Authorities and instead Defendants in disregarding this exculpatory information instructed, enabled and encouraged their Sims co-conspirators to help with contrivances against Plaintiff, against his Mother, all in a scheme and contrivances with Defendants Sims co-conspirators to cause extreme, purposeful, malicious and utlimately the extinction of Plaintiff's only Family who he so avidly dedicated his life and decades of his life to preserve, selflessly devoted his adult life to making certain that his Mother came before all else – and these Defendants with their Sims co-conspirators deliberately and maliciously enabling the Sims to conspire with Defendants to cause extreme, harsh, deliberate, and outrageous torts upon both Plaintiff and his Mother ruining both of their lives and ability to live out their lives peaceably together as they had done for decades prior 2021, and pior to all of the torts complained of herein.

70. Defendants by wrongfully anointing their Sims co-conspirators into the Community Hospital when forcibly removing Mrs. Abrahamson from her Home conspired with the Sims to contravene Indiana State Medicaid Guidelines Public Policy and and Procedure of both Medicaid and Medicare federally enacted Healthcare that Mrs. Abrahamson was enrolled in by Plaintiff and Plaintiff was her sole P.O.A. at his Mother's request and Defendants hid Plaintiff's Mother from all three attorneys she desired to protect her health and well being – and contriving with Defendants' Sims co-conspirators Defendants contravened Plaintiff's U.S. Constitutional rights and those of his Mother as more fully elaborated upon hereafter.

21

71. Moreover Defendants Ashcraft, Phipps, and Broelmann conspiring with the Sims illegally violated federal laws by not only allowing Defendants' Sims co-conspirators into the Hospital to monitor Plaintiff's Mother's medical care and partake in that medical care contrary to the Sims' Indiana State Licensure – Defendants' enabled this and hence enabled Defendants' Sims co-conspirators to illegally bill Medicaid for services by Defendants' Sims co-conspirators that Sims were unlicensed and unauthorized to provide in the Community Hospital as directed to do so by Defendants Ashcraft, Phipps, Broelmann and Defendants John Does 1-10.

72. Officer Ashcraft included inculpatory evidence that he knew to be false, in his probable cause affidavit supporting Plaintiff's arrest and criminal charges, made false statements, concealed key exculpatory evidence as stated in this Complaint such as illicit drug use in Plaintiff's Home by the Sims, a felony drug charge pending against the Sims, namely Maurice D. Sims, Jr., all of which Plaintiff telephoned the Munster Police Department and informed Defendant Broelmann and all Defendants of all of the preceding exculpatory information as it pertained to Plaintiff and the Sims false statements about Plaintiff in Ashcraft's P.C. Affidavit, and Plaintiff informed Defendants of Maurice D. Sims, Jr.'s pending felony charge which Defendant Broelmann acknowledged on more then two separate occasions to Plaintiff that he received Plaintiff's report of the Sims illicit and illegal activities in Plaintiff's Home as well as the pending Porter County, Indiana Felony Charge and multiple other criminal charges and convictions for drug use by the Sims reported to Defendants, as did Defendant Ashcraft also acknowledge receiving this exculpatory information pertaining to false Sims' witness statements written by Ashcraft in his Probable Cause Affidavit falsely accusing Plaintiff of outrageous false claims pertaining to illicit drug use by Plaintiff alleged by Sims, never seeking Healthcare for Plaintiff's Mother which Ashcraft new was plainly untrue stating affirmatively Mrs. Abrahamson was in the Hospital E.R. caused to be brought there via ambulance during the 2019 Covid-19 pandemic Plaintiff's advocacy for his Mother's health and well being – again exculpatory information Ashcraft's crafty gamesmanship to utilize evil individuals with multiple arrests and the proclivity for weapons, drug use, and felony charges pending in Porter County and felony convictions had in jurisdictions of Maurice D. Sims, Jr. and Maurice Sims, Sr. all known to Defendants Broelmann and Ashcraft brought to their attention by Plaintiff on several separate occasions while Defendants via their ploys and gamesmanship utilized their police powers with intentional malice to conspire with the Defendants' Sims co-

conspirators who Plaintiff repeatedly informed Defendants and State Regulatory Authorities of the Sims that the Sims and their cohorts in Plaintiff's Home were intentionally, repeatedly neglecting and detrimenting Plaintiff's Mother, Sims purposefully hurting her, Sims turning cameras, and Defendant Ashcraft chose to purposefully leave out all of this exculpatory information from the Ashcraft Probable Cause Affidavit and instead with Defendants chose to conspire with, contrive with Defendants' Sims co-conspirators to maliciously, purposefully and outrageously abuse their police powers to contravene the Constitutional guarantees of Plaintiff and his Mother further stated hereafter.

73.   Defendant Ashcraft's purposeful omission of the above exculpatory information was not the only tort by Defendant Ashcraft, in that Ashcraft contrived in the Ashcraft P.C. Affidavit that Plaintiff gave his Mother long passionate kisses and forced food down her Mouth which makes no sense in that Plaintiff sought out medical E.R. Hospital care for his Mother during Ashcraft's completely false statements which is "of record" who (albeit Plaintiff) and why Plaintiff's Mother was taken to the Hospital in the first instance, during the Covid-19 pandemic, as well as on numerous other separate occasions readily discernible from the Community Hospital E.R. medical History given to the E.R. physician by Plaintiff under Elaine Abrahamson's ("Mother") admissions/ present and past medical history in her medical admissions chart replete with information showing *prima facie* written evidence that Plaintiff was an advocate "for" Elaine Abrahamson's Healthcare and again Defendant Ashcraft purposefully left these exculpatory facts out of Ashcraft's Probable Cause Affidavit.

The sole reason Plaintiff's Mother was in the Emergency Room at Community Hospital over the past decade prior to Defendants causing her wrongful Death was because Plaintiff called "911" seeking Hospital/physicians' Healthcare for her as needed, taking urine specimens to the Community Hospital often weekly and monthly to the Microbiology Lab, Plaintiff making certain that the slightest malaise and discomfort Plaintiff saw his Mother experience he proactively advocated on his own initiative the knowledge and insight he had in these matters, due to Plaintiff's Mother encouraging him to follow in her "foot-steps" to get an education and advocate for himself and his Family, albeit his Mother always in the best possible manner and this plethora of exculpatory information in written form was of record with the Town of Munster; Plaintiff having discussed in past years with the Town Managers that he cared for his Mother and the Town Managers proffered the fact to Plaintiff that if he could not get requisite care to get his Mother to her wheel chairs, chairlifts and/or bed to call "911" and

Superior Ambulance was contracted with the Town of Munster for "lift assistance" which Plaintiff had to frequently utilize repeatedly during the 2019 Covid-19 pandemic due to Home Health non-skilled caregivers that Plaintiff hired "calling off" or not showing up repeatedly to Plaintiff's Home and Plaintiff having his own disabilities unable to move his Mother and Defendant Ashcraft purposefully omitted from the Ashcraft Probable Cause Affidavit all exculpatory information shared with him by Plaintiff in that he and Defendants purposefully conspired with their Sims co-conspirators to collectively contrive to impugn, detriment and severely injure Plaintiff, and thereby his Mother, when Ashcraft prepared the knowingly false inflammatory Ashcraft P.C. Affidavit aided and abetted by Defendants' Sims co-conspirators.

74.   Defendant Ashcraft purposefully prepared an erroneous Probable Cause Affidavit which purposefully left out much exculpatory information and included attestations by Defendant Ashcraft in the Probable Cause Affidavit Ashcraft knew were plainly untrue.

On or about May 29th, 2021 Plaintiff left his Mother with Maurice Sims, Sr. and a morbidly obese caregiver said to be "Hawkins" both seen on Plaintiff's Home cameras as soon as Plaintiff left his Home to quickly get some food for his Mother while she was to sit at the table in the kitchen and instead Sims, Sr. with Hawkins took Mrs. Abrahamson upstairs via chairlift to her bedroom, turned all three cameras aimed at her bed away from her bed and the caregivers yet one Southern-most camera still was aimed at a wall mirror which then reflected at an opposite wall mirror and Plaintiff saw on his smart phone App. Stopping his auto to see what if any further mischief Sims, Sr. and Hawkins were upto: and sure enough Sims, Sr. after turning the cameras was purposefully hurting Plaintiff's Mother like his son had earlier, ripped off her compression stocking which Plaintiff told all Sims staff not to do in that they previously tore Mrs. Abrahamson's thin skin on her legs, and threw her into her bed holding her limbs which was contraindicated again and wrong in that she had post-op bilateral hip replacements and severe fibromyalgia hence Plaintiff immediately phoned "911" told the dispatcher what had happened that Plaintiff was near the Munster P.D. and he would meet a Defendant Munster P.O. John Doe #1 in front of the Police Station which occurred.

75. Despite the preceding being shown to Defendant P.O. John Doe #1 he incredulously was avidly trying to talk Plaintiff out of having John Doe #1 accompany Plaintiff to his Home and Plaintiff had to insist that his Mother is being hurt by Sims, Sr. and Hawkins shown to Defendant P.O. John Doe #1 and only after Plaintiff insisting he finally relinquished his arguing not to go on a five minute drive to Plaintiff's Home and Defendant P.O. John Doe #1,

24

and Defendant P.O. #2 showed-up at Plaintiff's Home approximately approximately thirty minutes later giving time for Sims, Sr. and his wife LaTresa Sims to disappear from the Home and another caregiver by the name of

76.    On June 4th, 2021 Officer Ashcraft swore under oath in an Information charging Plaintiff with neglect of his Mother, giving his Mother medication off the street from friends and not pharmacies, with snorting this same medication, from not seeking medical care when necessary for his Mother, from making certain she had completely voided stool into the commode that this was somehow inappropriate when needing to treat her hemorrhoids with a topical ointment so they would not bother her in that the Sims were not licensed to apply any topical ointments such as this, and Ashcraft thereby inflicting  injuries upon Plaintiff and upon Plaintiff's Mother -  causing her to be forcibly removed from Plaintiff's care and Home, causing Plaintiff's Mother to die and hence causing her wrongful death.

77.    Officer Ashcraft's allegations and affirmations in the Affidavit were false and he knew this.

78.    Officer Ashcraft procured Plaintiff's arrest and prosecution by misleading the prosecutor and the Court.

79.    Officer Aschcraft's Probable Cause Affidavit contained omissions of exculpatory

evidence and fabrication of inculpatory evidence.

80.    Officer Ashcraft's Probable Cause Affidavit states that LaTresa Sims states: that her entity Sims Signature Home Health Care LLC ("**LLC**") performs "Home Health Care" which is not true, in that it provides Home Health Aides whose sole purpose is to perform solely Non-skilled Home Healthcare Tasks, emphasis added, such as to assist with transferring Plaintiff's Mother and to assist with assisted daily living chores ("ADL's") such as bathing, brushing teeth, toileting, assistance with feeding, cleaning the Home, and Sims' Contract specifically states that it does not provide any "health care" and health care providers must be sought for such care in or outside of Plaintiff's Home.

81.    Plaintiff's Mother had extremely painful conditions that ordinarily are treated with "Lyrica" or "Cymbalta" both of which Plaintiff obtained via physicians for his Mother and both caused dangerous side effects of peripheral edema, severe and dangerous swelling of his Mother's feet and ankles hence it was agreed with physicians that "scheduled analgesia" such as Tylenol, Mirica and similar would keep her comfortable without life-threatening side-

effects and Defendant Officer Ashcraft nor any other Munster Police Officer asked Plaintiff about this whatsoever.

82.    Plaintiff's Mother had gastrointestinal ("**G.I.**") disease of which Plaintiff is very Familiar with as he has similar G.I. ailments and Plaintiff treated his Mother with stool softeners and she had external and internal hemorrhoids which were treated with "topical hemorrhoid" cream and in the elderly population decreased "G.I." motility is not only a problem it can be life-threatening causing impaction and if not properly dealt with fecal aspiration – none of Plaintiff's Mother's symptoms nor diseases of which Defendant Police Officer Ashcraft discussed at anytime with Plaintiff which Plaintiff is knowledgeable of and made certain his Mother saw both Home Health Care Physician providers and Plaintiff regularly sought care for his Mother for her Gastrointestinal Disease and all other Organ Systems of which she had acute or chronic past illness at highly esteemed medical centers outside of Plaintiff's and Plaintiff's Mother's living area.

83.    Defendant Police Officer Ashcraft misrepresents that Plaintiff changed his Mother's brief in a public restaurant which is false in that Plaintiff, just prior to the Probable Cause Affidavit signed and averred to its veracity by Defendant Ashcraft on June 3rd, 2021  had a recent left hip replacement, right hip disease, both knees with torn knee caps (torn menisci), a left inguinal hernia repair, and a right inguinal hernia repair, a recurrence of the right inguinal hernia and hence this misrepresentation by Defendant Police Officer Ashcraft would be impossible for  Plaintiff  to do and was never done by Plaintiff which Ashcraft was informed of prior to preparing the false P.C. Affidavit.

84.    Defendant Officer Ashcraft misrepresents Plaintiff was practicing medicine  by caring for his Mother by allowing his Mother to reside in Plaintiff's Home and Defendant Ashcraft falsely implies having chosen to care for his Mother due to her requesting him to do so in Plaintiff's Home is criminal activity of practicing medicine which again is plainly untrue.

85.    Defendant Ashcraft does not state in the Probable Cause Affidavit that he was told in advance of the Probable Cause Affidavit averred to by Ashcraft that when Plaintiff was queried by Ashcraft: Plaintiff told Ashcraft that he never gave his Mother any non-prescribed medicine(s), he never crushed his Mother's medicine(s) to snort, and affirmatively told Ashcraft that the Sims' caregiver, namely Maurice D. Sims, Jr. ("Sims, Jr."), had a felony prosecution pending in Porter County, IN., and Ashcraft viewed Plaintiff's video clip on Plaintiff's "smart phone" of Sims, Jr. vaping a drug in Plaintiff's Home and turning cameras to

face walls all of which occurred in or about May, 2021 and all of which Ashcraft and other Defendant John Does 1-10 acknowledged he and Defendant Dan Broelmann were told of by Plaintiff, and they knew all of this exculpatory evidence provided in advance of the false P.C. Affidavit being prepared by Ashcraft and nevertheless Defendant Ashcraft and the other Defendants made a policy-making decision to purposefully did not include this exculpatory information in the Ashcraft's false contrived untrue Affidavit as it was intentionally replete with false accusations contrived by Ashcraft in that there was a plethora of information he and Defendants were shown in the Home and entered Plaintiff's Home on several separate occasions in advance of the contrived false P.C. Affidavit being prepared by Ashcraft against Plaintiff, which Defendants knew, and replete with the purposeful omissions of exculpatory information, such as Sims' Home Agency caregivers doing drugs around Plaintiff, in Plaintiff's home, around Plaintiff's Mother, using vulgarities in front of Plaintiff's Mother which Defendants Ashcraft, Phipps, Broelmann and P.O.'ers John Does 1-10 and John Does 1-10' were told this by Plaintiff as well and all Defendants were also told and shown that the Sims were also illicitly turning cameras to walls throughout Plaintiff's home to do illicit acts such as using drugs in the Home which Maurice D. Sims, Jr. did while having a felony drug charge pending against him, and Maurice Sims, Sr. purposefully hurting Plaintiff's Mother, turning multiple cameras, and Plaintiff calling the Police Department to report Sims, Sr. and his caregiver Hawkins, via a "911" call to the Munster P.D.: Plaintiff insisting that Officers be dispatched to Plaintiff's Home on or about May 30th, 2023 which two Munster P.D. Officers did do and none of this exculpatory information was included in Aschcraft's "Probable Cause Affidavit", despite knowing all of this exculpatory information and that inculpatory information by so-called witnesses was erroneous and hence the P.C. Affidavit was contrived by Defendants as stated - making it specious, untrue and Defendant Ashcraft intentionally omitting exculpatory information as well as including inculpatory information that was contrived by Defendants such as Plaintiff passionately kissing his Mother in the Hospital Emergency Room and forcing food down Plaintiff's Mother's throat which Plaintiff never did and despite Defendant Ashcraft so stating Defendants never asked Plaintiff about this because they knew it was false, contrived and plainly untrue and was so outrageous did not even make any rational sense.

86.   Defendants also never asked Plaintiff what "pain medication" was dispensed to his Mother by Plaintiff nor taken by him and Defendant Ashcraft purposefully misrepresents that Plaintiff illegally "operated a motor vehicle" under the influence of "pain medicine" when taking Tylenol for arthritis and nutrient analgesia such as Mirica for arthritis, and Tart Cherry for gout – and Defendants would just have to ask their "so-called" witnesses how do you know this information -  they didn't because this was not discussed with non-skilled cargivers that Plaintiff was avidly requesting Defendants to report to the Porter County Indiana Prosecutor where the pending Sim's, Jr. felony charge originated from in May through June, 2021. Plaintiff's illnesses and taking medications for them was shared with Defendants, namely Anderson, Broelmann, and Ashcraft which are hereditary debilitating illnesses of Plaintiff some of which required surgeries and Defendant Ashcraft misrepresents Plaintiff taking his medications and/or nutrients as Plaintiff informed these Defendants would be criminal activity of Plaintiff.    Officer Ashcraft contends in the "Probable Cause Affidavit" information that he was informed of in advance of the Affidavit being prepared was inculpatory which was Plaintiff plainly untrue and Ashcraft knew this in that the nutrient bottles were on the kitchen table as were Elaine Abrahamson's prescribed medicines all of which Ashcraft viewed and was shown by Plaintiff prior to making up a false P.C. Affidavit.  If Defendants never ever bothered to ask the State Authorities or Hospital Authorities about these false contrivances that Plaintiff vitiated by showing these Defendants his Mother whenever they desired, showing these Defendants her prescribed medicines out on the kitchen table in such instance it becomes apparent to the Court that these Defendants made a "policy-making decision" to prepare a false Affidavit for whatever reason to falsely contrive with their Sims co-conspirators in that no one advocating for their loved one in their right mind would let the Sims with proclivity for illegal drugs, turning cameras, hurting Mrs. Abrahamson on video, possessing and discharging illegal weapons into a Hospital Room with an elderly person under false pretenses which is exactly what these Defendants despite having seen prima facie evidence of all of these Sims criminal and/or mischievous acts were enabled by these Defendants to do just that -  surround Mrs. Abrahamson in the Hospital and be allowed to further their contrivances to hurt Plaintiff and his Mother with false accusations.

87. Defendant Ashcraft, Phipps and Broelmann all conspired with their co-conspirators Sims to wrongfully not only impugn the veracity of Defendants' co-conspirators the Sims but instead to violate Plaintiff's U.S. and Indiana State Constitutional rights as stated in this

Complaint as well as the U.S. and Indiana State Constitutional rights of Plaintiff's Mother – and thereby causing her wrongful death on July 2nd, 2021.

88.  In his probable cause affidavit Officer Ashcroft misrepresents all inculpatory information therein in that Defendants purposefully left out all exculpatory evidence that Plaintiff mentions herein which was brought to the attention of Defendants Ashcraft, Phipps, Broelmann and all exculpatory evidence mentioned herein and brought to the attention of theses Defendants about the Sims, pertaining to Drs. Providing Home Health to Plaintiff's Mother in the Home in April through June 2021 was left out fo the Probable Cause Affidavit as well as all of the criminal pending felony information pertaining to the Sims, their proclivity for drug use in Plaintiff's Home, turning cameras, Osco Medication bottles on the kitchen table out in the open which Defendant Police Officers John Does 1-10 picked up and read aloud from the prescription bottles dispensed to Plaintiff's Mother and also on her nightstand in her bedroom – none of which exculpatory evidence was included in Defendant Ashcraft's Probable Cause contrived Affidavit against Plaintiff and resulting in Plaintiff's Mother's wrongful death.

### Plaintiff's Damages

89.  Plaintiff was incarcerated in the Lake County Indiana jail and prison for crimes he did not commit.

90.  Plaintiff was purposefully deprived of his ability to have the benefit being with his only Family Member, his widowed Mother, who he cherished deeply and who he cared for avidly and all Defendants purposefully hid Plaintiff's Mother from Plaintiff, from Plaintiff's criminal defense attorney, and from her attorneys to advocate for her and  to assure her that they would do everything in their power to make certain she was safe, well taken care of, and would be reunited with Plaintiff as soon as possible.

91.  Further, violating Plaintiff's constitutional right to remain with his Family (Plaintiff's Mother was his sole Family nucleus that he and his Mother chose to peaceably live with for over a decade in that Plaintiff did not have any children or a Family of his own prior to his Mother passing).

92.  Defendants in their conspiracy against Plaintiff and thereby his Mother's well being, safety and longevity -  instructed the Sims co-conspirators to falsely maintain to Community Hospital staff that Sims co-conspirators were not hired by Plaintiff, and instead to falsely maintain to illegally gain entry into Mrs. Abrahamson's Hospital Room at Community Hospital by a State Regulatory Agency affiliated with the Medicaid Waiver Program – which deceit, contrivance and conspiracy by Defendants with the Sims co-conspirators was plainly false, deceptive and a contrivance correlative to Defendants' Ashcraft P.C. Affidavit to impugn, severely injure and bring about wrongful isolation of Plaintiff and resulting in the wrongful isolation, IIED to Mrs. Abrahamson, separation of Mrs. Abrahamson from her written desire to be cared for to live peacefully with Plaintiff and all of Defendant's contrivances as stated herein resulted in extreme, isolation Plaintiff and his Mother, both of their needless suffering due to Defendants' torts stated herein,  and then the death of Plaintiff's Mother due to Defendants' illegal acts as stated.

93.  In furtherance of Defendants conspiracy to deprive Plaintiff and his Mother of their guaranteed U.S. Constitutional rights enumerated hereafter, the Defendants informed their Sims co-conspirators of Plaintiff's Mother's whereabouts in Community Hospital and instructed the Sims co-conspirators to lie to Hospital medical staff and contend that the Sims co-conspirators were licensed by the State of Indiana and authorized by the State of Indiana and federal reimbursement programs, namely Medicare and Medicaid, to thereby gain illegal entry into Plaintiff's Mother's Community Hospital Room with Defendants aiding and abetting their Sims co-conspirators in their wrongful acts contravening state laws, federal laws, privacy laws, the Fourth and Fifth Amendments of the U.S. Constitution as these rights are, and were guaranteed to, Plaintiff and his Mother -  all purposefully and maliciously contravened by Defendants as stated herein.

94.   Defendants in so doing the above, conspiring and contriving with their Sims co-conspirators against Plaintiff and his Mother, had their Sims co-conspirators substitute their attendant care falsely posing as medical staff – when in fact they had no medical skill training or licensing by the State of Indiana (or any other State) whatsoever -  and instead had proclivity for drugs (multiple drug convictions and a pending felony charge in Porter County Indiana of Maurice D. Sims, Jr.) and their proclivity for criminal acts committed in Plaintiff's Home in May and June, 2021 was made known to Defendants by Plaintiff via showing

Defendant Ashcraft, Phipps and informing Defendant Broelmann of the Sims co-conspirators of their criminal acts in Plaintiffs Home, in Porter County Indiana and the pending Felony Drug Charge of Maurice D. Sims, Jr. while in Plaintiff's Home – and all of this exculpatory information instead of being incorporated in the Defendant Ashcraft's P.C. Affidavit, Defendants went about an agenda enlisting their Sims co-conspirators to commit that egregious, illegal, and wrongful acts stated herein upon Plaintiff and his Mother resulting in the illegal state and federal violations of law as more specifically provide in the Counts against these Defendants enumerated hereafter.

95.   Defendants wrongfully abused their police powers and conspired with the Defendant Sims co-conspirators to impugn Plaintiff's integrity by purposefully leaving out a plethora of exculpatory information pertaining to Sims co-conspirators' multiple illegal acts in Plaintiff's Home, all of which Sims' illegal acts was exculpatory in nature, refuted the Sims false accusations pertaining to Plaintiff, contrived by the Sims because Plaintiff reported the Sims to State Regulatory Authorities over the Sims' non-skilled Home Health "LLC" registered with the State, and reported the Sims' illegal acts in Plaintiff's Home against Plaintiff and his Mother to: Defendant Broelmann, Defendant Ashcaft, Defendant Phipps, Defendants John Does 1-10, and John Does 1-10' all of which exculpatory information (exculpatory as it pertained to "false reporting" that Sims made pertaining to Plaintiff to others about Plaintiff's care of his Mother).

96. Defendants illicitly ignored Plaintiff and not only did not bother to annul Sims retaliations against Plaintiff for reporting them to the Police, Defendants, and instead enabled them as stated herein to further hurt Plaintiff and his Mother.

97  Defendants  anointed their Sims co-conspirators in lieu of Plaintiff and his attorney, Plaintiff's Mother's attorneys to advocate for her or to appoint an independent guardian and instead elected incredulously to staff her Hospital room with Defendants' Sims co-conspirators and  to surround Plaintiff's Mother in Community Hospital solely with the Sims co-conspirators directing medical staff in medical care and in Defendants' contrivances with the Sims co-conspirators to cause unnecessary tests that caused unnecessary battery to Plaintiff's Mother such as unnecessarily forcing Plaintiff's Mother to undergo vaginal  and anal exams, unnecessary blood draws for HIV and sexual blood chemistries, while Defendants having encouraged their Sims co-conspirators to direct Hospital physicians, registered nurse, ancillary Hospital staff to do unnecessary medical procedures, blood draws and other

31

ancillary intrusive tests upon Plaintiff's Mother by Defendants having vitiated Plaintiff's multiple Power of Attorneys for Health Care on Plaintiff's Mother medical chart and illicitly substituting Defendants' chosen co-conspirators to derail, infringe upon and violate the United States Constitutionally protected rights of Plaintiff and those of his Mother by doing all illicit acts stated herein.

98.     Defendants co-conspired with their Sims co-conspirators to fraudulently pose as Health care workers in the Community Hospital and as to falsely "hold themselves out" to Hospital staff and authorities as being hired by a government agency, when the Defendants knew full well that their Sims co-conspirators were hired solely by Plaintiff in that Plaintiff phoned the Munster Police Department and spoke with the P.D. Field Commander, Defendant Broelmann, informing him of the Defendants' Sims co-conspirators proclivity for drugs, hurting and abusing Plaintiff's Mother, and yet Defendants facilitated not only the Sims' false and illegal entry into Plaintiff's Mother's Hospital Room which is in of itself criminal.

99.  Plaintiff also suffered from the loss of his Mother by Defendants' wrongful conduct as stated in this Complaint.

100.    This time was emotionally, physically, and psychologically dehumanizing and debilitating, and Plaintiff has suffered from constant fear and anxiety, deep depression, despair, boredom and loneliness due to Defendants purposeful defamation to Plaintiff and taking his only remaining Family member from him, isolating and incarcerating him in front of Plaintiff's Mother and thereafter.

101. After Plaintiff's criminal felony charges were all summarily dismissed months after being arrested on June 4th, 2021 Four Supervisors in the Lake County Indiana Prosecutor's Office all summarily agreed that the entire criminal docket should be expunged well in advance of the usual and customary interval of waiting one year for expungement to occur.

102.    Plaintiff continues to live under the effects of his isolation, incarceration, and depression, and, under the stigma of his wrongful arrest and malicious prosecution is now labeled in the public domain as a "negligent son" which despite Defendants' conspiring to impugn Plaintiff in the most inconceivable despicable manner possible, for caring for and advocacy of his Mother – the antithesis of this defamation labeling of Plaintiff in actuality was and is true.

103. Additionally, Plaintiff suffered, and continues to suffer, egregious pain and suffering, physical injury, humiliation, constant fear, anxiety, deep depression, despair, and severe mental distress and anxiety from Defendants' tortious obdurate misconduct as state in this Complaint, Plaintiff's wrongful arrest, malicious prosecution, severe defamation, Defendants' IIED upon Plaintiff, and Defendants' purposeful malicious isolation of Plaintiff from his only Family and causing her wrongful Death.

## V. Claims

104.    Plaintiff incorporates the foregoing allegations as if set forth fully herein.

105.    Defamation consists of (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. It is defamation *per se* to falsely accuse another of a crime.

106.    Defendants Ashcraft's, Phipp's, Broelmann's, John Does' 1-10, John Does' 1-10' actions described in this Complaint constitute an unlawful seizure, in terms of the lack of probable cause for the arrest of Plaintiff, in contravention of the Fourth Amendment, actionable pursuant to 42 U.S. C. § 1983.

107.    Defendants Ashcraft's, Phipp's, Broelmann's, John Does' 1-10, and John Does' 1-10' actions constitute an unreasonable and/or a malicious prosecution, in violation of the Fourth and/or Fourteenth Amendments, actionable pursuant to 42 U.S.C. § 1983.

108.    Plaintiff reserves the right to proceed with any and all claims which the facts averred in this Complaint support, pursuant to the notice pleading requirement of Federal Rule of Civil Procedure 8.

## COUNT I - 42 U.S.C. § 1983
### Due Process
### (Fourteenth Amendment)

109.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

110.    Defendants Ashcraft and Phipps in their individual non-governmental capacity, Supervisory P.O.'s, Broelmann and Scheckel in their individual non-governmental capacity, Town Manager Dustin Anderson  in his individual non-governmental capacity, the Town of Munster not as a respondeat superior but for its municipal "policy or practice" and a

33

deliberate choice of all Defendants in their non-governmental capacities breaching, by means of their "policy or practice", wrongfully and illegally causing, breaching and/or inflicting upon Bruce Michael Abrahamson ("**Plaintiff**"), and where stated upon Plaintiff's Mother ("**Elaine Abrahamson**"), each and all of individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, imprisonment of Plaintiff, removal of Plaintiff's Mother against her will from her Home, the wrongful separation of Plaintiff from seeing and communicating with his Mother in any manner whatsoever for months isolating her and Plaintiff from any communication whatsoever from each other, as well as Defendants' conspiring collectively to purposefully hide Plaintiff's Mother from:

a) Plaintiff and;

b) Plaintiff's criminal defense attorney and;

c) other attorneys that were counsel that his Mother engaged (apart from Plaintiff's defense counsel) to protect his Mother from Defendants illicit wrongful acts against Plaintiff and his Mother described herein.

110.    Defendants conspired with, encouraged, and facilitated illicit and illegal activity of the Sims co-conspirators to not only infringe upon Plaintiff's Fourteenth Amendment right to live freely and peaceably with his Mother to ensure her constitutional rights but Defendants purposefully when hiding Plaintiff's Mother from Plaintiff, and from multiple attorneys, to protect her, which said attorneys' tried to locate her to no avail due to Defendants hiding Plaintiff's Mother from him and attorneys as stated – continued these illicit contrivances in violation of the U.S. Constitution.

111.    Defendants knew that Plaintiff properly cared and advocated for his Mother and despite this fact disregarded the exculpatory information stated above purposefully leaving any and all exculpatory information out of Ashcraft's P.C. Affidavit, instead Defendants contriving with the Sims co-conspirators causing the malicious torts to Plaintiff of wrongful arrest and incarceration, hiding Plaintiff's Mother from anyone that could advocate for her and ensure her well being and safety all resulting in Plaintiff's Mother's isolation, detriment physically, emotionally resulting in Defendants causing Plaintiff's Mother's wrongful death.

112.    Defendants knew Plaintiff had enrolled Plaintiff's Mother in the Indiana Medicaid Waiver Program in that Plaintiff informed Defendants of this fact and were aware of the State regularly overseeing Plaintiff's Mother's Home care living peaceably in her Home and Defendants nevertheless forced Plaintiff's Mother into the Hospital with their Sims co-

conspirators and instructed their Sims co-conspirators to illegally surround, guard and monitor the contrivances and illicit misconduct of Defendants illegally informing their Sims co-conspirators to enter the Community Hospital where Defendants forcibly removed Elaine Abrahamson to, and at the direction and monitoring of their Sims co-conspirators breached Mrs. Abrahamson's HIPPA rights to privacy, to remain peaceably in her Home, to have counsel of her chosing, causing the Sims co-conspirators to assist Defendants guard Mrs. Abrahamson in furtherance of their contrivances, stated above, violating not only Plaintiff and Mrs. Elaine Abrahamson's rights to live peaceably in their Home without: government intrusion, invasion, forcible removal, and without Mrs. Abrahamson having the benefit of Plaintiff's advocacy nor independent advocacy of counsel whatsoever - an attorney of her chosing – all resulting in the violation of Plaintiff's and Mrs. Abrahamson's due process rights under the Fourth and Fourteenth Amendment of the U.S. Constitution.

113.    Defendants anointed in place of Mrs. Abrahamson's duly appointed Power of Attorney for Health Care and all other acts whatsoever on file with the Community Hospital, with State Authorities, and with all Hospitals Mrs. Abrahamson frequented in 2021 and immediately prior, all known to Defendants, ignored this exculpatory information as it related to Plaintiff and the false charges Defendants levied against Plaintiff, disregarded theses facts and instead also disregarded the Sims co-conspirators multiple criminal convictions, past and pending felony charges against them, proclivity for selling drugs, weapons, consumption of drugs in Plaintiff's Home and on his Property – violating Plaintiff's Mother in every conceivable manner possible as stated above all seen on video and audio recordings shown both to Defendants and State Authorities nevertheless Defendants contrived, conspired, effectuated with Defendant Ashcraft a specious "Ashcraft P.C. Affidavit" in violation of Plaintiff's, and his Mother's, Fourth and Fourteenth Amendment rights - and by doing so resulting in extreme malicious and intentional detriment to both Plaintiff and his Mother .

114.    Defendants under their contrivances stated herein with the Sims co-conspirators caused Plaintiff's Mother's IN. Medicaid waiver to be wrongfully terminated, her multiple Power of Attorneys appointing Plaintiff her duly authorized Representative to protect all of her interests, Healthcare and otherwise – and wrongfully misusing Defendants' police powers under false and contrived pretense(s) with their Sims co-conspirators - unnecessarily forced Mrs. Abrahamson out of the comforts of her Home into Community Hospital and anointed the Defendants' Sims co-conspirators to gain entry into Mrs. Abrahamson's Community

Hospital Room, unnecessarily billing Mrs. Abrahamson's federally funded Medicare and Medicaid, all by Defendants misusing their "police powers" to the extreme detriment of Plaintiff, Plaintiff's Mother, and in direct violation of the Fourth and Fourteenth Amendments.

115.    By Defendants doing each of the immediately above illegal acts and assigning Defendants' Sims co-conspirators to be anointed in place of Plaintiff and in place of any independent attorney whatsoever of Mrs. Abrahamson's chosing these Defendants thereby contravened Plaintiff's constitutional rights, as well as his Mother's constitutional rights  – hence causing his Mother to be confused, isolated like Plaintiff, and thereby causing Plaintiff's Mother's extreme isolation and suffering and soon thereafter  while suffering Defendant's wrongful misuse of their police powers causing her wrongful suffering for months and then resulting in her wrongful death cause by Defendants's illegal acts stated herein.

116.    Defendants thereby assisted their Sims co-conspirators to violate federal statutes and State Statutes to illegally bill Plaintiff's Mother's federal protected Medicare insurance and her Medicaid Insurance during the period of time Defendants instructed their Sims co-conspirators to guard, direct medical staff, poison Plaintiff's Mother with false information contrived by Defendants and their Sims co-conspirators while at the same time thereby violating Plaintiff's and his Mother's constitutionally protected rights to live peaceably, free from tyranny by these Defendant's illegal acts and their conspiracy as state in this Complaint. Defendants violated federally enacted Health Information Public Policy Act "HIPPA" Statutes, conspiring with their Sims co-conspirators to effectively poison Plaintiff's mind with erroneous false information, defaming Plaintiff not only to Community Hospital staff, to the Public, and to Plaintiff's Mother and to her severe detriment -    thereby effectively causing the wrongful death of Plaintiff's Mother and undoing all of the good deeds that Plaintiff did for his Mother to keep her thriving and well for decades prior to her wrongful death caused by Defendants.

117.    Additionally, these same Defendants, together with Defendants,  John Does 1-10, and John Does 1-5, individually, jointly, and in conspiracy, caused the wrongful inability of Plaintiff to care for his Mother within Plaintiff's Home directly and forcibly causing the wrongful inability of Plaintiff to make certain that his elderly Mother remained cared for by Plaintiff pursuant to her desire to avoid Hospitalization, to avoid entry into a Nursing Home after Defendants as stated first caused a battery of tests their Sims co-conspirators gaining

access to Plaintiff's Mother illegally contrary to federal statutes and additionally Plaintiff and his Mother to both undergo a barrage of questions that Plaintiff showed Defendants that their Sims co-conspirators had proclivity for Drugs, purposefully hurting Plaintiff and his Mother because Plaintiff reported Defendants' Sims co-conspirators not only to the Munster, IN. Police Department and Defendants but also to State Authorities in writing, showing State Authorities and these Defendants the multiple videos of Defendants' Sims' co-conspirators turning all of the cameras throughout Plaintiff's House away from Plaintiff's Mother and away from Defendants' Sims co-conspirators while all in Plaintiff's Home and thereafter Defendants wrongfully conspired with the Sims co-conspirators to forcibly remove both Plaintiff and his Mother from their Home they lived peaceably in for several decades, instructing Defendants' Sims co-conspirators to illegally enter Community Hospital hiding Plaintiff's Mother their and Defendants directing the Sims co-conspirators to effectuate Defendants' illegal and illicit contrivances gainst Plaintiff and his Mother, Defendants thereby confusing, disrupting, and attempting in every conceivable manner possible to alienate Plaintiff's sole Family Member from him and in so doing Defendants Ashcraft, Phipps, John Does 1-10, and John Does 1-10', all causing Plaintiff's Mother's wrongful death.

118.   These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution, and imprisonment by committing or causing to be committed one or more of the following acts: constructing and fabricating false and totally unreliable information from witnesses Defendants knew to be unreliable and knew to be committing illicit acts against Plaintiff and his Mother, having been convicted and/or charged of misdemeanor criminal acts either pending and/or adjudicated for illegal drug and weapons charges, that Plaintiff brought to the attention of:   Defendant Ashcraft, Defendant Phipps, Munster Police Field Commander Lieutenant Dan Broelmann and Munster Police Officers John Does 1-10 and Munster Police affilate Law Enforcement Agents John Does 1-10' and nevertheless Defendants purposefully contrived, conspired, and coached the Sims' "witnesses" identified in Defendant Ashcraft's Probable Cause Affidavit to make false outrageous statements and which formed the basis for Plaintiff's wrongful incarceration, charging, malicious prosecution, forcible separation and inability in any mannger whatsoever to communicate with Plaintiff's Mother (by phone, electronically via Zoom, with a Monitor present) and instead hiding her; and by Defendants coaching their "so-called Sims' witnesses" to manufacture and fabricate false witness testimony that formed the basis to falsely arrest Plaintiff, force Plaintiff's Mother from

Plaintiff's care and from Plaintiff's home; and by Defendants also withholding from prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that Defendant Ashcraft's "Probable Cause Affidavit" was false, totally unreliable, illicitly and illegally contrived and constructed and coached by Defendants; by suppressing, destroying and preventing the discovery and development of additional exculpatory findings and evidence, including, but not limited to, the instruments of Plaintiff's video evidence as well as other exculpatory evidence; by Defendants Ashcraft, Phipps, and Lieutenant Dan Broelmann giving false and incomplete versions of events to prosecutors and Judges; by writing false reports and coaching false testimony of the Sims' identified witnesses in Defendant Ashcraft's contrived Probable Cause Affidavit; by improperly influencing the Magistrate hearing Plaintiff's case to charge Plaintiff, inter alia, thereby causing extreme outrageous false public statements to be made and disseminated about Plaintiff and his Mother; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of Hospital physician findings, encouraging the Sims witnesses to unlawfully enter Community Hospital and enter Plaintiff's Mother's Hospital room, and thereby causing abuse, imprisonment and forced placement of Plaintiff's Mother into the Hospital by Defendants' conspiracy as stated herein; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and his constitutional right to care for and assure Plaintiff's Mother's well being, both by inter alia Plaintiff, his attorney, and his Mother's attorneys and violating Plaintiff's right to live peacefully in his Home with his elderly Mother without Defendants' depriving Plaintiff and his Mother of their Constitutionally protected liberties to peaceably live in Plaintiff's Home without intrusion, invasion by Defendants' false contrivances coaching Sims' witnesses omitting a plethora of exculpatory information from Defendants' Ashcraft's "Probable Cause Affidavit".

Defendants Ashcraft, Phipps, Broelmann, John Does 1-10, and John Does 1-10', individually, jointly, and in conspiracy, caused the wrongful charging, malicious prosecution, imprisonment, isolation of Plaintiff from his only Family Member and her wrongful death, all resulting in IIED of Plaintiff.

119.    Additionally, these same Defendants, together with their Sims co-conspirators, individually, jointly, and in conspiracy, caused continuation of the wrongful malicious prosecution by fabricating false information about forcing food down Plaintiff's mouth and

kissing his Mother "passionately", and making statements about Plaintiff's having applied hemorrhoid cream and before so doing making certain there is no excrement covering her hemorrhoids and with the Sims co-conspirators making outrageous false statements that so doing was "rape" of Plaintiff's Mother due to her advanced age necessitating ADL assistance with most every ADL which Plaintiff's supervised as necessary at the request of his Mother, the advice of her health care professionals over the course of decades.

120.  These Defendants caused and/or continued Plaintiff's wrongful charging, prosecution and imprisonment by committing or causing to be committed one or more of the following acts: in a ploy and contrivance of Defendants they unannounced on at least three separate occasions appeared at Plaintiff's Home and did not give Plaintiff any inclination that he was under investigation by Defendants instead in a ruise utilizing the fact that Plaintiff phoned Defendants and State Authorities to report the Sims for illicit, illegal and activity in Plaintiff's Home and his Property and using these facts as a means to not at any time forewarn Plaintiff that he was under investigation and in continuation of Defendants' ploy and gamesmanship did not at any time give Plaintiff any requisite notice of his "Miranda rights" nor any Miranda warning even on June 4th, 2021 when Defendant again unnanounced arrested Plaintiff  having coerced information from him leading him to believe their appearances at Plaintiff's Home were due to Plaintiff's reporting of the Sims and Plaintiff sharing video, audio and written evidence of Sims illegal and illicit acts in Plaintiff's Home and on his Property, constructing and fabricating false and totally unreliable contrived witness statements with Defendants' Sims co-conspirators which formed the basis for Plaintiff's charging, incarceration, malicious prosecution; by manufacturing and fabricating false witness testimony that formed the basis to Plaintiff's false arrest; by also withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that the Ashcraft Probable Cause Affidavit was false, totally unreliable, constructed and coerced the Sims co-conspirators to contrive against Plaintiff to avoid the Sims losing their State Home non-skilled attendant-care approval through the IN. Medicaid Program and to avoid Maurice Deavonta Sims, Jr. violating his plea Agreement to stay away from drugs for a time definite and then the Porter County Felony Drug charge against Sims, Jr. would be dismissed and both the Sims and Defendants knew and saw that Plaintiff had video/audio evidence of Sims, Jr. doing illegal vaping of illegal drugs in Plaintiff's Home; by suppressing, destroying and preventing the discovery and development of additional exculpatory findings

and evidence, including, but not limited to, the instruments of Plaintiff's advocacy of her prescription medicine having been prescribed my her Home Health physician, chairlifts, compression stockings, incontinence supplies, a dual shower/commode wheelchair to readily transfer Mrs. Abrahamson from bed to commode to shower quite easily - as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by improperly influencing the judge(s) and/or magistrate(s) hearing Plaintiff's case, inter alia, by making false public statements about Plaintiff "raping his Mother" by Plaintiff making certain no excrement remained on his Mother's derriere before applying with a gloved hand Hemorrhoid cream to predominantly external hemorrhoids when inflammatory can impede passage of stool, tear and cause significant bleeding per rectum which occurred some years earlier to Plaintiff's Mother and Plaintiff phoned "911" seeking an ambulance and Plaintiff was in the Home with some of the same Defendant's some years earlier then during the instant contrivances and policy decision on this instant occasion in or about April, May, June 2021 wherein Defendants through their policy making decision(s) caused the removal of Plaintiff and his Mother from their Home and their incarcerations:  Plaintiff in prison and his Mother surrounded by the Defendants' co-conspirators to effectuate the specious contrived torts upon the Abrahamsons.  Beyond the contrivances and policy-making decision to wrongfully contravene the Abrahamsons' U.S. and State Constitutional guaranteed rights enumerated hereafter Defendant Ashcraft not only contrived with Defendants' Sims co-conspirators to present the contrived, embellished and false Ashcraft P.C. Affidavit to prosecutorial authorities – beyond this he purposefully embellished it with false affirmations that a "fact-finder" in reviewing facts and evidence can readily determine that said P.C. Affidavit is embellished by Ashcraft and plainly untrue:

a) Ashcraft avers under oath that Plaintiff was forcing food down his Mother which could only be done with a feeding tube or similar in that an adult that doesn't want food and isn't a paraplegic, which Mrs. Abrahamson was not, would solely have to:

i)    push away the food with her hands and/or:

ii)   purse her lips to impede the intake of food and/or:

iii)  spit out any food and/or fluids as falsely alleged in the embellished contrivances inserted into the false P.C. Affidavit and/or:

iv)   scream to surrounding E.R. staff for help and assistance who are and in and out of an E.R. open Room that Defendant Ashcraft himself states all is on a "real time" monitor in this

E.R. Room and E.R. staff would alert Security and/or Police if indeed this abuse occurred and none of this occurred because it was a false affirmation, contrivance and embellishment by Defendant Ashcraft in the P.C. Affidavit in that he and Defendants, with their Sims co-conspirators, made false statements that are easily rebutted by a "fact finder".    Instead the policy maker Defendants namely: Police Chief Scheckel, P.D. Commander Broelmann, Detective Ashcraft, Detective Phipps with their training, would know that even a child, as well as a grown healthy adult, which Mrs. Abrahamson was or she would not have been cleared for transfer from an Emergency Hospital Room, in Community Hospital, to a general Hospital Room on one of the main floors of the Hospital having been determined to be stable  soon thereafter and for discharge to a Nursing Home in Lake County which Nursing Home has no Drs. "in house" and nevertheless Ashcraft's false embellishments in the Affidavit was an attempt to "railroad" Plaintiff into a malicious prosecution and a conviction (which conviction never happened) was contrived by Defendants and "on its face" can be determined by a "fact finder" to be plainly Defendants' embellishments, contrivances and is corollary to the plethora of exculpatory evidence that Plaintiff informed Defendants of, and that was known to these Defendants, or certainly was readily available but was purposefully left out the Ashcraft Affidavit: pertaining to Plaintiff's:  diligent, prompt, extensive  -  both in an emergent manner but also in a preventative manner, wherein Plaintiff in April, May, June 2021 as well as in prior years, rendered care for Plaintiff's Mother so that she continued to thrive and to be Healthy and content in her chosen environment which she was living peaceably with her son in her chosen Home for decades.

Plaintiff informed Defendants in advance of the false Ashcraft P.C. Affidavit being prepared by Ashcraft that he applied hemorrhoid cream to treat her hemorrhoids which Sims were non-skilled non-trained to render Home Healthcare, solely "non-skilled" transfer of Mrs. Abrahamson, showering, ADL's, feeding, light house keeping, etc; and by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic drug use by the Sims in Plaintiff's Home, turning cameras away toward walls from the Sims and Mrs. Abrahamson for Sims to abuse Mrs. Abrahamson; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial hearing regarding the false contrived  Ashcraft P.C. Affidavit and not to be wrongfully arrested, maliciously prosecuted, forcibly separated from

41

his only Family and isolated in the Community, then in 2021 and now, as guaranteed by the United States Constitution.

121. Additionally and/or alternatively, the Defendants named above failed to intervene to stop Plaintiff's wrongful prosecution and resultant imprisonment despite having the opportunity and duty to do so as stated herein.

122. The actions of Defendants Ashcraft, Phipps, Broelmann, John Does 1-10, and John Does 1-10', in depriving Plaintiff of his right to  Miranda warnings and Miranda rights, the intentional exclusion of exculpatory evidence if indeed any Probable Cause Affidavit needed to be prepared at all in view of Defendants contriving inculpatory evidence therein:

**123. FIRST**:   on their own as stated above and as stated herein, Ashcraft stating Paintiff force fed his Mother which cannot be true as stated above and if true, it was not - she would purse her lips, push food away, turn her head, and/or shout/scream for help if this were true, and moreover there are real time monitoring cameras in the Community Hospital E.R. patient holding Rooms of which my Mother was caused to enter by Plaintiff and also video Monitors at the  Hospital nursing stations as Plaintiff's Mother had been in this E.R. on other separate occasions during the pandemic and prior, as necessary and as determined by Plaintiff to be necessary advocating for his Mother and her remaining well - and Plaintiff having no other Family to assist him care for his Mother would go Home five to ten minutes away by car in the past and Drs. and/or nurses who he told to watch his Mother he didn't want anything to happen to her assured Plaintiff they would informing him they had closed circuit real time cameras to make certain she would be alright if left alone while Plaintiff drove Home to eat and/or obtain anything he or his Mother was in need of hence Plaintiff can aver herein pertaining to "forced feeding" closed circuit monitors and camera footage captioning this information and with large glass pane floor to ceiling sliding doors enabling Hospital staff to see Plaintiff and his Mother in the E.R. Room  – Plaintiff "force feeding" his Mother was falsely averred to by Ashcraft, was a bold face lie, no video footage was found to this effect by anyone, and it was falsely averred to and contrived by Ashcraft in the P.C. Affidavit also correlates to:

**124. SECOND**:  in the same E.R. Room immediately above pertaining to "forced feeding" with large glass pane floor to ceiling glass sliding doors between E.R. patient Elaine Abrahamson and the Hospital staff going in and out of said E.R. and thereby able to see into the said Room Ashcraft's additional false inculpatory averment in his P.C. Affidavit falsely

averred that Plaintiff gave his Mother long passionate kisses - which again if his Mother did not was to be kissed she simply would and could push her son away, turn her head, push Plaintiff away with her hands and arms which she did not do.

**125. THIRD**:   in fact what she would often do is every day several times a day of her own initiative and wanting was to say to Plaintiff, "thank you for helping me, I love you very much" and most every day she would similarly purse her lips together after Plaintiff prepared her breakfast lunch and dinner and chatted with her she would state give me a kiss and Plaintiff would give his Mother a kiss which she would do throughout the Abrahamsons' entire lifetime until Defendants due to their policy-making decision with a contrived false P.C. Affidavit decided to insert this falsity too causing torts Plaintiff avers to by Defendants as stated in Plaintiff's Claims section hereinafter.

**126. FOURTH**:  Defendants rather then make a police report as Plaintiff did to Defendant Broelmann via telephone in or about May, 2021 and which the Defendant Munster P.D. acknowledged when Plaintiff phoned and asked for Defendant Broelmann via phone to make certain Field Commander Broelmann made Plaintiff's police report pertaining to the Sims doing drugs in and around Plaintiff's Home, purposefully hurting his Mother, turning Plaintiff's Home cameras away from Sims, their Family and staff to hurt his Mother and hide to do drugs in and/or outside Plaintiff's House on his Property, notifying the Porter County Prosecutor's Office that Maurice D. Sims, Jr. was in violation of his pending Felony probation/bail release agreement and Plaintiff had film footage reported to and acknowledged viewed by these Defendants Ashcroft, Phipps, and Broelmann, made a policy-making decision to impede Plaintiff's multiple police reports to the Defendant Munster P.D. via "911", in person reports to these same Defendants and/or by phone and not only impeded Plaintiff's reports to the Police of the Sims continued proclivity for drug activity in and around his Home, his Mother, hurting his Mother, turning cameras and having pending felony charge(s) and/or convictions.

127.    Instead these Defendants made the policy-making decision to enlist Sims co-conspirators to assist Defendants to gain unlawful entry into Community Hospital, surround Plaintiff's Mother in her Hospital Room(s), direct her medical care along with render medical care within the Hospital and to illegally bill Plaintiff's Medicare and/or Medicaid for healthcare services that Defendants' Sims co-conspirators were neither licensed to perform, did not perform, and in furtherance of the policy-making decision for the Defendants to

commit torts against the Abrahamsons instead of Defendants assisting Plaintiff in making his police reports against the Sims to both the Defendant Munster Police Department and Defendants in furtherance of their contrivances which resulted in the torts stated in Plaintiff's claims hereafter – including but not limited to by their torts Defendants causing the wrongful isolation of Mrs. Abrahamson and her son's wrongful incarceration and malicious prosecution - resulting in Mrs. Abrahamson's death.

128.    Defendants illicitly contrived with their Sims co-conspirators to commit torts upon Plaintiff and purposefully target Plaintiff's association to live peaceably with his only Family and for his Mother to have anointed in Plaintiff's stead a duly authorized attorney of his Mother's chosing and/or to have the Court appoint a guardian independent attorney and instead targeted the Abrahamsons' to conspire with Defendants' policy-making decision to annoint the Sims caregivers ignoring their criminal felony convictions, pending charges and past criminal mischief of public record with the Sims caregivers' proclivity for illegal drug dealing and use of drugs in Plaintiff's Home and in their pasts, turning cameras in the home, hurting Mrs. Abrahamson and nevertheless hid Plaintiff's Mother from him under contrived false pretense which these Defendants abused authority to allow to occur; conspiring with the Sims caregivers anointed by these Defendants to guard, scheme, contrive and direct Mrs. Abrahamson's journey to her isolation from her son and by means of said Defendants policy-making decisions caused Plaintiff and his Mother to both be enjoined by these Defendants from their due process rights depriving the Abrahamsons' of their right of Family association , for Mrs. Abrahamson to avoid institutionalization thereby.

129.    Defendants' gamesmanship with their Sims co-conspirators was the initiative, intentional malice, and the policy-making decision of these Defendants to not only enjoin and deprive Plaintiff from having his Attorney, or his Mother's Attorneys advocate for her, or in the alternative an independent guardian appointed by the Court to make certain Mrs. Abrahamson could live in her Home, not be neglected and detiorate as she did thereby causing extreme IIED upon an elderly life-long citizen of the State of Indiana who admirably served with the Board of Trustees appointed for twelve years by Governor Bowen and Governor Orr (three four year terms "pro bono" for both Indiana University and Purdue University) going to meetings throughout the State without remuneration for so doing

because of her love of her education and her nursing profession which she proudly completed in Indiana.

130. Instead Defendants chose a policy-making decision to prepare a contrived Probable Cause Affidavit leaving out exculpatory information, included false maliciously maligned contrived, outrageous misinformation with their Sims co-conspirators into the false contrived Ashcraft P.C. Affidavit elements of which were not only not true but "shock the conscience" as well as wrongfully imprisoning Plaintiff separating him from his only Family, and having his Family separated and hidden from him.

131. Defendants impeded his Mother's Attorneys from timely locating her, instead isolating and hiding her from them and from Plaintiff's Attorney and, additionally and/or alternatively, in failing to intervene to stop said violations, were the direct and proximate cause of the injuries to Plaintiff, as well as the causation of the wrongful death of Plaintiff's Mother - which scheme and artifice of Defendants is set forth above.

132. The actions of Defendants in depriving Plaintiff and his Mother of their rights to:

i) (a) fair and truthful police report(s) Plaintiff made pertaining to the Sims, their Family and co-worker co-horts and:

ii) a fair and truthful P.C. Affidavit without inserting false inculpatory evidence against Plaintiff and without the exclusion of exculpatory evidence from therein and:

iii) policy-making misconduct of Defendants by failing to report Sims' drug convictions of multiple felony and misdemeanor charges in a police report repeatedly made and requested by Plaintiff both in person and by phone all of which torts were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

Additionally and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

The Defendants' misconduct directly resulted in the unjust and wrongful criminal malicious prosecution of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to U.S. and State Constitutional guarantees, guaranteed by the Fourteenth Amendment.

133. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, the wrongful loss of his Mother, and other grievous and continuing injuries and damages set forth above.

45

134.  The misconduct described in this Count by the Munster PD Defendants was undertaken pursuant to the policy and practice of the Defendants Town of Munster and the Defendant Munster Police Department, in the manner more fully

described below in  Count V.

**WHEREFORE**, Plaintiff demands judgment against Defendants for substantial compensatory damages, and, additionally, for substantial punitive damages against all Defendants plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT II- 42 U.S.C. § 1983
### Coercive Interrogation, Failure to Promptly Appoint a Guardian, Hiding Mrs.Abrahamson's whereabouts and Disallowing Plaintiff's Attorney to Interview Mrs. Abrahamson – No Access For any Defense Attorney(s) to Intervene Promptly (Fifth and Fourteenth Amendments)

135.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

The actions of Defendants individually, jointly, and in conspiracy making policy-making decision(s) against Plaintiff without any advice of the fact that Defendants were not making any police reports as made against the Sims caregivers and instead Defendants anointed the Sims caregivers as authorized to further commit criminal and illegal mischief upon the Abrahamsons, not be fully forthcoming that Defendants were not investigating the Sims caregivers and that in reality Plaintiff was the subject of Defendants' interrogation and thereby failure to provide to Plaintiff any Miranda warnings, anointing Sims caregivers as illegal co-conspirators in Defendants inflicting torts upon the Abrahamsons, and improperly denying Plaintiff his right to appoint and provide his Mother full access to legal advocacy and legal representation to prevent her from being neglected which policy-making decision by Defendants wrongfully inflicted upon the Abrahamsons, thereby denying and depriving access illegally to Mrs. Abrahamson to remain in her Home and prevent her deterioration by being neglected and further abused under false pretense to allow Mrs. Abrahamson to solely be surrounded in her Hospital Room by the Sims caregivers thereby using torture techniques which "shock the conscience" to inflict IIED upon Plaintiff and his Mother to intentionally target and purposefully derail the Abrahamsons' right their Family association,  instead by Defendants' policy-making decision to anoint Sims caregivers after forcibly removing Mrs.

46

Abrahamson from her Home without a guardian nor benefit of counsel – hiding her with the Sims all of which in pertinent part from Defendants' illicitly contrived policy-making decisions against the Abrahamsons resulted in the false and fabricated Ashcraft P.C. Affidavit that was subsequently used against Plaintiff resulting in incarceration and malicious prosecution, and thereby violated Plaintiff's Fifth and Fourteenth Amendment rights to be free from compulsory deprivation of liberty without due process of law as guaranteed by the United States Constitution.

136.   The actions of Defendants' policy-making decisions in using a form of torture by disregarding Plaintiff's multiple police reports via phone and in person on several separate occasions and other coercive techniques to trick Plaintiff, and/or, in encouraging, condoning and permitting the use of said techniques, and/or failing to intervene to stop the illegally contrived illicit hiding of Plaintiff's Mother and directly invading and targeting the Plaintiff's right to peaceably associate with his Mother as was the Abrahamsons' desire, were the direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

Additionally, and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, IIED, and other grievous and continuing injuries and damages set forth above.

137.  The misconduct described in this Count by the Munster P.D. Defendants was undertaken pursuant to the policy and practice of the Munster Police Department, in the manner more fully described below in Count V.

**WHEREFORE**, Plaintiff demands judgment against Defendants for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

### COUNT III – 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

138.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

139.   In the manner described more fully above, the Defendants, individual, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured, and left out exculpatory evidence in order to accuse Plaintiff of criminal activity and to cause the institution  of criminal proceedings against Plaintiff, without probable cause.

140.   In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments  These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

141.    The judicial proceedings against Plaintiff were terminated in his favor when the Lake County Prosecutor dismissed all charges against him and all four Supervisors in the Lake County Prosecutor's Office collectively agreed with the Lake County Prosecutor that an immediate expungement of the entire criminal proceeding should be done instanter due to the outrageous, inflammatory untrue statements contrived by Defendants and due to Defendants leaving out a plethora of exculpatory evidence.

142.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

143.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

The misconduct described in this Count by the Munster P.D. Defendants was undertaken pursuant to the policy and practice of the Munster Police Department, in the manner more fully described below in Count V.

**WHEREFORE**, Plaintiff demands judgment against Defendants for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT IV - 42 U.S.C. § 1983, 1985, 1986
## Conspiracy to Deprive Constitutional Rights

144. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

145. Defendants together with the named and other unsued co-conspirators, including police and prosecutorial investigative, supervisory, executive, and command personnel, together reached an understanding, engaged and continue to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

146. Because said conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is elderly, disabled, and was an advocate for his disabled Mother who was elderly numerous other disabled victims with disabilities which are protected by equal protection of the laws and/or of equal privileges and immunities under the law, and with animus toward the Plaintiff and the other victims of this motivated conspiracy, the Defendants also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. § 1985 to peaceably live with his only Family member and directly disregarded this entitlement and right. Additionally, or alternatively, Defendants Anderson, Scheckel, and Broelmann, knowing that the above §1985 conspiracy to torture and wrongfully maliciously prosecute Plaintiff was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C.§1986.

147. Additionally, and alternatively, these actions were taken maliciously, willfully, wantonly and/or with reckless disregard for Plaintiff's constitutional rights.

148. The misconduct described in this Count by the Munster P.D. Defendants was undertaken pursuant to the policy and practice of the Munster Police Department, in the manner more fully described below in Count V.

**WHEREFORE**, Plaintiff demands judgment against Defendants for substantial compensatory damages, and, additionally, for substantial punitive damages against

49

Defendants plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT V- 42 U.S.C. § 1983
### *Monell* Policy Claim Against the Town of Munster

149. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

150. The actions of Defendants Anderson, Scheckel, Broelmann, Ashcraft and Phipps as alleged above, were done pursuant to one or more interrelated de facto policies, practices and/or customs of the Defendant Town of Munster.

151. At all times material to this complaint, the Defendant Town of Munster through its Police Department, Police Commanders, Police Detectives, Managers, Town Council and/or the Town's Counsel's Office, had interrelated de facto policies, practices, and customs which included, inter alia:

a. conducting physically, psychologically or otherwise illegal or improperly coaching during interrogations of witnesses, and being totally untruthful to arrestees in order to obtain confessions and wrongful convictions, including with the use of torture
techniques under the command and supervision of Defendants Scheckel, Broelmann, Ashcraft and Phipps.

b.  conducting illegal or improper coercive and deceptive interrogations of witnesses, suspects and arrestees suspected of being involved in an infraction or otherwise advocating for a protected class and defending them from police officers in order to obtain arrests, malicious prosecutions, including with the use of a type of torture technique such as wrongful arrest as a policy-making decision under the command and supervision of Defendants Anderson, Scheckel, Broelmann, Ashcraft, or Phipps.

c. manufacturing, fabricating, and/or using improper suggestive tactics to obtain false witness statements and;

d. the filing of false reports, and giving false statements and testimony about said interrogations and fabricating or constructing parts or all of a Probable Cause Affidavit that are untrue, suppressing and excluding exculpatory evidence concerning said interrogations, pursuing and obtaining wrongful malicious prosecutions and false imprisonments on the basis of false contrived Probable Cause Affidavits obtained during said interrogations, denying suspects their right to full and fair access to the courts by excluding exculpatory evidence, and

otherwise covering up the true nature of said interrogations and exculpatory evidence, particularly in circumstances where conspiracies with unreliable witnesses like the Sims are used as co-conspirators and such techniques were used by detectives Ashcraft and Phipps under the command and supervision, and with the active participation of, Defendant Broelmann;

e. the failure to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in a-c above; f. the failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who were repeatedly accused of abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercively questioning or interrogating witnesses, suspects and arrestees, particularly persons who were deceived by deception, not permitted to be advised of their Miranda rights lied to during taking police reports either by phone or in person. This failure to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control includes the "repeaters" Defendants Anderson, Scheckel, Broellman, Ashcraft, and Phipps; g. the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-e above whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report:

h. Said code of silence also includes police officers either remaining silent, invoking the Fifth Amendment, or giving false and misleading information during official investigations in order to protect themselves and/or fellow officers from internal discipline, civil liability, and/or criminal charges,and perjuring themselves in criminal cases where they and/or their fellow officers have otherwise unconstitutionally interrogated a witness and/or suspect, arrestee, or falsely arrested, imprisoned and maliciously prosecuted a criminal defendant, particularly in cases where fabricating inculpatory evidence, omitting exculpatory evidence - techniques under the command and supervision of Defendant Broelmann, and Defendant Ashcraft are employed.   Egregious examples of this code of silence

51

in racially profiling cases is evidenced and invoked in response to several Personal Injury
Plaintiffs' attorneys have investigated and prosecuted Defendants as evidenced on
the Pacer System in federal U.S. District Courts:

h. Covering up and suppressing evidence and findings; refusing to ***properly***
investigate, arrest and charge, continuing to finance the defense of Defendant
Town of Munster and the Munster P.D., P.O.'ers and detectives, who have been sued
for their misconduct,  and otherwise attempting to both publicly and judicially defend
these officers'  actions, and otherwise obstructing justice in police racially profiling cases,
particularly those that arise at the Northern Borders of Munster, IN. and the Southern-most
Areas and Borders of Hammond, IN. and the South-East-most Borders and Areas of
Calumet City, IL wherein minorities are racially profiled and constantly
"pulled over" under the supervision, and with the participation of, and policy-making
of Defendants Anderson, Scheckel and Broelmann.  Said interrelated policies, practices and
customs, as set forth above, both individually and together, were maintained and
implemented with deliberate indifference; they encouraged, inter alia, the coercing of
statements from suspects under false pretense(s), as well as from witnesses and arrestees
being coerced and manipulated, by threats of confiscation of vehicles and related abusive
tactics and techniques, the construction and fabrication of confessions, admissions,
statements, identifications, and other false witness evidence, the suppression and destruction
of evidence of deception and destruction of other exculpatory evidence,
the intimidation of witnesses, the making of false statements and reports, the giving of false
testimony, the obstruction of justice, the manipulation and obstruction of the State and
Federal courts, and the pursuit and continuation of wrongful malicious prosecutions
and false arrests and imprisonments; and were, separately and together, a moving force
behind, and a direct and proximate cause of, the unconstitutional acts and perjury committed
by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff
and Plaintiff's Mother's wrongful death:

152.  Additionally, the Town of Munster's said failure to properly train, discipline,
monitor, control, assign, transfer, supervise, and counsel Defendants Town of Munster and
Munster P.D. unidentified Police Officers, who were involved in numerous other acts of
similar policy-making of disregarding and allowing illicit acts of false averments, deception,
suppression of evidence, and omission of exculpatory evidence, and racial profiling as

52

described above, as well as Defendants Anderson, Scheckel, Broelmann, Ashcraft and Phipps was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to Plaintiff and the wrongful death of Plaintiff's Mother:

153.   Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above, by Munster governmental, executive Town Council Members and police policymakers, including, but not limited to, successive Police Commanders, including Defendants Scheckel and Broelmann, and their direct subordinates, including, but not limited to, Defendants Ashcraft and Phipps, and several Town Managers, most notably Defendant Manager Dustin Anderson, who continues to publicly both ratify, obfuscate and deny his involvement in said conduct, establish that said constitutional violations were directly and proximately caused by the Town of Munster and its Police Department.

**WHEREFORE,** Plaintiff demands judgment against Defendant Town of Munster for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT VI – State Law Claim
## Malicious Prosecution

154.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

155.   Defendants  individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Plaintiff.    Said prosecution was ultimately terminated, dismissed, and expunged instanter by the State Court in Plaintiff's favor.

156.   The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

**WHEREFORE,** Plaintiff requests that Defendants and their counsel to abide by the expungement order of the State Court and not to enter any prosecutorial evidence into the Pacer System Public electronic filing system or into the public domain unless consented to in writing by Plaintiff and instead that any and all such expunged information be shared solely electronically to Plaintiff's email:  baimportant@gmail.com  and kept hidden from public view in compliance with the State Court ordered expungement of Defendants' malicious prosecution of Plaintiff including but not limited to Defendant Ashcraft's Probable Cause Affidavit.

Plaintiff demands  compensatory damages, jointly and severally from
Defendants, and, additionally, for punitive damages against Defendants plus attorneys' fees,
the costs of this action and whatever additional relief this Court deems equitable and just.

## **COUNT VII – State Law Claim**
### **Intentional Infliction of Emotional Distress**

157.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.
Defendants individually, jointly, and in conspiracy, by, inter alia, prepared a false Probable
Cause Affidavit leaving out a plethora of exculpatory information not only from Plaintiff
but as evidenced in public records, Hospital records that Defendant Ashcraft accessed and
Health Professionals that knew Plaintiff sought medical professional care for his Mother
during the 2019 to 2022 pandemic and prior thereto, and had been told by Plaintiff about
caregivers causing bruising upon Plaintiff's Mother when transferring her and bruising
occurring with the removal and application of compression stockings upon Plaintiff's Mother
which was not inserted into the Ashcraft P.C. Affidavit, that prescribed medicines for his
Mother were out in the open of Plaintiff's Home which Defendants Ashcraft and Phipps and
other unidentified P.O.'er entered and saw first-hand and Plaintiff showed P.O.'ers and this
exculpatory evidence too was intentionally not placed into Ashcraft's P.C. Affidavit, and/or by
failing to insert exculpatory evidence into the P.C. Affidavit, not preventing nor stopping the
above stated said IIED by the Sims caregivers and illicitly inserting them into Mrs.
Abrahamson's Hospital Room(s) to allow the emotional abuse, physical torture and abuse,
complete isolation of Mrs. Abrahamson from any of her and/or Plaintiff's attorney(s) as stated
above, by constructing and fabricating a false prejudicial Ashcraft P.C. Affidavit omitting
exculpatory evidence and including inculpatory evidence that Ashcraft knew was plainly false
and fabricated both by him and the "so-called witnesses", and by then using the false
contrived prejudicial P.C. Affidavit to wrongfully incarcerate Plaintiff, intentionally target the
Abrahamson's Family mutual agreement to live peaceably together, and as stated above in an
attempt to procure Plaintiff's malicious prosecution, conviction, and imprisonment for crimes
Plaintiff did not commit by means of said false Ashcraft P.C. Affidavit, engaged in extreme and
outrageous misconduct.

158.  Additionally, this same Defendant, together with the other named Defendants, individually, jointly, and in conspiracy, engaged in additional extreme and outrageous conduct inter alia, by fabricating, and suppressing other false evidence, by continuing to permit the Sims caregivers to not only assist and be co-conspirators in the isolation of Plaintiff's Mother from any attorneys of her chosing, an independent Court appointed guardian, causing hence the imprisonment of Plaintiff and targeted separation and isolation of Plaintiff by every means possible and hiding her with the Sims permitted to accompany her illicitly into her Hospital Room(s) after procuring a false charging Order based upon the contrived false P.C. Affidavit, by refusing to investigate, make police reports on Defendants' Sims co-conspirators who were  known to have proclivity for drugs, illegal weapons, a pending felony charge, past felony charges and arrests, fleeing prosecutors to avoid prosecution, and were known physical abusers of Mrs. Abrahamson as shown to Defendant Ashcraft and reported to other P.O. Defendants, and by knowingly making false public statements about Plaintiff.

159.  Defendants, intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress – IIED.

As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was, and continues to be, injured, and has, and continues to, experience severe emotional distress, including nightmares, and sleep disruption.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory damages, plus the costs of this action, and such other relief as this Court deems equitable and just.

### COUNT VIII – State Law Claim
### Conspiracy and Defamation

160.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here. Defendants with the named and other unsued co-conspirators, including police and investigative, supervisory, executive, and command personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute and to intentionally inflict continuing severe emotional distress on Plaintiff.

161. In furtherance of this conspiracy or conspiracies, the Defendants named above in this Count, together with their unsued co-conspirators, committed the overt acts set forth in the facts above.

162. Said conspirac(ies) and overt acts were and the results therefrom are continuing in nature and will continue should the Court enable the torts to continue, the defamation to be left unchecked, and continue to ruin the balance of Plaintiff's life if left unchecked.

163. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

**WHEREFORE,** Plaintiff demands compensatory damages, jointly and severally from Defendants and, additionally, for punitive damages against Defendants plus attorneys' fees, the costs of this action and whatever additional relief this Court deems equitable and just.

### COUNT IX – State Law Claim
### *Respondeat Superior*

164. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

Defendants, were, at certain times material to this complaint, although employees of the Defendant Town of Munster, in that Defendants are sued individually and were making policy-making decisions and which they attempted to conceal via conspiracies and contrivances against Plaintiff and his Mother and were not acting within the scope of their employment but were making policy-making decisions and doing illicit acts against Plaintiff and their acts of which violated state law are directly chargeable to the Defendant Town of Munster under state law pursuant to respondeat superior in this instance.

**WHEREFORE,** Plaintiff demands judgment against the Town of Munster and the Munster P.D. for any and all compensatory damages awarded on Plaintiff's state law claims against the Defendants named in this Count, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT X

### Section 504 of the Rehabilitation Act of 1973 and
### Title II of the Americans with Disabilities Act ("ADA")

165. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

166. Defendants with the named and other unsued co-conspirators, including police and investigative, supervisory, executive, and command personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to maliciously prosecute and to intentionally inflict continuing severe emotional distress on Plaintiff.

Award Plaintiff his costs and Attorneys' fees pursuant to 29 U.S.C. Sect. 794 a , U.S.C. Sect. 12133, 42 U.S.C. Sect. 1988 and any and all other applicable statutes.

**WHEREFORE**, Plaintiff demands judgment against Defendants for any and all compensatory damages awarded on Plaintiff's claims as stated above against the Defendants named in this Count, plus the costs of this action and whatever additional relief this Court deems equitable and just.

**Jury Trial Requested**

Respectfully submitted,

Bruce Michael Abrahamson, Plaintiff

Bruce Michael Abrahamson
8840 Baring Ave
Munster, IN. 46321    PH.# 219-237-9510

CERTIFICATE OF SERVICE

I certify that on the 5th day of June, 2023, I served a copy of the foregoing Complaint on each of the Defendants to C/O the Mr. Dustin Anderson, Town Manager, 1154 Ridge Road, Munster, IN. 46321 by means of depositing in the U.S. mail via First Class Delivery and electronic transmission through Summons of the Clerk of the U.S. District Court, Northern Division, Hammond, IN. 46320.

Signature:

Bruce M. Abrahamson

-A SECT 1983 & ADA U.S. DISTR COURT COMPL. A V ASHCRAFT MUNSTER ET AL 4 16 2023